FOLGER LEVIN & KAHN LLP

ATTORNEYS AT LAW

Embarcadero Center West
275 Battery Street, 23rd Floor
San Francisco, California 94111
Telephone 415.986.2800
Facsimile 415.986.2827

Los Angeles Office:
1900 Avenue of the Stars, 28th Floor
Los Angeles, California 90067
Telephone 310.556.3700
Facsimile 310.556.3770

www.flk.com

July 28, 2009

**BY HAND DELIVERY**

Circuit Clerk of Court
Ninth Circuit Court of Appeal
James R. Browning Courthouse
95 7th Street,
San Francisco, CA 94103

Re:   Appeal No. 08-35057:  Notice of Supplemental Authority Under FRAP
      Section 28(j)

Dear Circuit Clerk:

Pursuant to Federal Rule of Appellate Procedure 28(j), *amicus curiae* National Disabilities Rights Network ("NDRN") hereby submits the attached Testimony Before the House of Representatives' Committee on Education and Labor as supplemental authority for the Court's consideration in the above-referenced matter.  The testimony, provided by the Governmental Accountability Office ("GAO") in May of 2009, is offered to refute the contention put forward by *amici curiae* National School Boards Association, et al. that Protection and Advocacy Agency oversight of public schools is unnecessary to protect students with disabilities.  [*Amici Curiae* Brief of National School Boards Association, et al. p.3]

In response to reports from organizations including NDRN alleging that students with disabilities in both public and private schools were being subjected to restraints or seclusions in schools, often leading to injury and/or death, Congress asked the GAO to investigate.  The GAO found that there have been hundreds of allegations of such conduct over the past two decades, and it examined the details of ten restraint and seclusion cases in which there had been findings of wrongdoing.  The GAO found several prominent themes in these cases.  It found that children were restrained and secluded even when they did not appear to be physically aggressive and that some of the restraints used proved fatal.  Moreover, it found that teachers and staff in these cases were often not trained in the proper use of restraints, and that the teachers and staff involved in at least half of these cases continue to be employed as educators.  The GAO's testimony reveals the prevalence and gravity of unlawful restraint and seclusion of students with disabilities.  The testimony also reflects the apparent lack of sufficient training, oversight, and remedial action by the school administrators in these cases.  For each of these

FOLGER LEVIN & KAHN LLP

Clerk of Court
July 28, 2009
Page 2

reasons, it is clear that there is a crucial need for Protection and Advocacy Agency expertise and oversight where there are allegations that students with disability have been abused.

Very truly yours,

Jason M. Horst
FOLGER LEVIN & KAHN LLP
Counsel for *amicus curiae*
National Disabilities Rights Network

cc:     Holly Johanknecht, Megan K. Allison
            Disability Law Center of Alaska
        Bradley D. Owens,
            Jermain Dunnagan & Owens, PC

69000\9001\663180.1

United States Government Accountability Office

# GAO

Testimony
Before the Committee on Education and
Labor, House of Representatives

For Release on Delivery
Expected at 10:00 a.m. EDT
Tuesday, May 19, 2009

# SECLUSIONS AND RESTRAINTS

## Selected Cases of Death and Abuse at Public and Private Schools and Treatment Centers

Statement of Gregory D. Kutz, Managing Director
Forensic Audits and Special Investigations



**GAO**
Accountability * Integrity * Reliability

GAO-09-719T



### G A O
**Accountability · Integrity · Reliability**

# Highlights

Highlights of GAO-09-719T, a testimony before the Committee on Education and Labor, House of Representatives

**May 19, 2009**

# SECLUSIONS AND RESTRAINTS

## Selected Cases of Death and Abuse at Public and Private Schools and Treatment Centers

## Why GAO Did This Study

GAO recently testified before the Committee regarding allegations of death and abuse at residential programs for troubled teens. Recent reports indicate that vulnerable children are being abused in other settings. For example, one report on the use of restraints and seclusions in schools documented cases where students were pinned to the floor for hours at a time, handcuffed, locked in closets, and subjected to other acts of violence. In some of these cases, this type of abuse resulted in death.

Given these reports, the Committee asked GAO to (1) provide an overview of seclusions and restraint laws applicable to children in public and private schools, (2) verify whether allegations of student death and abuse from the use of these methods are widespread, and (3) examine the facts and circumstances surrounding cases where a student died or suffered abuse as a result of being secluded or restrained.

GAO reviewed federal and state laws and abuse allegations from advocacy groups, parents, and the media from the past two decades. GAO did not evaluate whether using restraints and seclusions can be beneficial. GAO examined documents related to closed cases, including police and autopsy reports and school policies. GAO also interviewed parents, attorneys, and school officials and conducted searches to determine the current employment status of staff involved in the cases.

View GAO-09-719T or key components. For more information, contact Gregory Kutz at (202) 512-6722 or kutzg@gao.gov.

## What GAO Found

GAO found no federal laws restricting the use of seclusion and restraints in public and private schools and widely divergent laws at the state level. Although GAO could not determine whether allegations were widespread, GAO did find hundreds of cases of alleged abuse and death related to the use of these methods on school children during the past two decades. Examples of these cases include a 7 year old purportedly dying after being held face down for hours by school staff, 5 year olds allegedly being tied to chairs with bungee cords and duct tape by their teacher and suffering broken arms and bloody noses, and a 13 year old reportedly hanging himself in a seclusion room after prolonged confinement. Although GAO continues to receive new allegations from parents and advocacy groups, GAO could not find a single Web site, federal agency, or other entity that collects information on the use of these methods or the extent of their alleged abuse.

GAO also examined the details of 10 restraint and seclusion cases in which there was a criminal conviction, a finding of civil or administrative liability, or a large financial settlement. The cases share the following common themes: they involved children with disabilities who were restrained and secluded, often in cases where they were not physically aggressive and their parents did not give consent; restraints that block air to the lungs can be deadly; teachers and staff in the cases were often not trained on the use of seclusions and restraints; and teachers and staff from at least 5 of the 10 cases continue to be employed as educators. The table contains information on four of these cases.

### Examples of Case Studies GAO Examined

| Victim information | School | Case details |
|---|---|---|
| Male, 14, diagnosed with post traumatic stress | Texas public school | • 230 lb. teacher placed 129 lb. child facedown on floor and lay on top of him because he did not stay seated in class, causing his death.<br>• Death ruled a homicide but grand jury did not indict teacher. Teacher currently teaches in Virginia. |
| Female, 4, born with cerebral palsy and diagnosed as autistic | West Virginia public school | • Child suffered bruising and post traumatic stress disorder after teachers restrained her in a wooden chair with leather straps—described as resembling a miniature electric chair—for being "uncooperative."<br>• School board found liable for negligent training and supervision; teachers were found not liable, and one still works at the school. |
| Five victims, gender not disclosed, aged 6 and 7 | Florida public school | • Volunteer teacher's aide, on probation for burglary and cocaine possession, gagged and duct-taped children for misbehaving.<br>• No records that school did background check or trained aide.<br>• Aide pled guilty to false imprisonment and battery. |
| Male, 9, diagnosed with a learning disability | New York public school | • Parents allowed school to use time out room only as a "last resort," but school put child in room repeatedly for hours at a time for offenses such as whistling, slouching, and hand waving.<br>• Mother reported that the room smelled of urine and child's hands became blistered while trying to escape.<br>• Jury awarded family $1,000 for each time child was put in the room. |

Sources: Records including police reports, court documents, and interviews.

**United States Government Accountability Office**

Mr. Chairman and Members of the Committee:

Thank you for the opportunity to discuss the use of restraints and seclusions on children and teens in public and private schools and selected treatment centers. In the context of this testimony, a restraint is defined as any manual method, physical or mechanical device, material, or equipment that immobilizes or reduces the ability of an individual to move his or her arms, legs, body, or head freely. Seclusion is the involuntary confinement of an individual alone in a room or area from which the individual is physically prevented from leaving. [1]

In certain circumstances, teachers and other staff may decide that it is necessary to restrain or seclude children in order to protect them from harming themselves or others. For example, some doctors and teachers contend that using seclusions and restraints can reduce injury and agitation and that it would be very difficult for organizations to run programs for children and adults with special needs without being able to use these methods. However, GAO has previously testified that these techniques can be dangerous because they may involve physical struggling, pressure on the chest, or other interruptions in breathing.[2] We found that children are subjected to restraint or seclusion at higher rates than adults and are at greater risk of injury. Even if no physical injury is sustained, we also testified that individuals can be severely traumatized during restraint. In addition, as part of our prior investigations of residential programs for troubled youth, we highlighted cases where staff at some programs employed unsafe restraint techniques, resulting in the death and abuse of teens in their care.[3] Recent reports by advocacy groups indicate that similar restraint techniques have been used at public and private school throughout the country. For example, in January 2009, the National Disability Rights Network issued a report documenting dozens of

---

[1] These are excerpts from the definitions used by the Centers for Medicare and Medicaid Services (CMS) and they apply to all hospitals participating in the Medicare and Medicaid programs. 42 C.F.R § 482.13(e)(1)(i)-(ii). We chose to use the CMS definitions because there are no federal statutes that apply to seclusion or restraint in the context of public or private schools.

[2] GAO, *Mental Health: Extent of Risk from Improper Restraint or Seclusion is Unknown*, GAO/T-HEHS-00-026 (Washington, D.C.: Oct. 26, 1999).

[3] GAO, *Residential Treatment Programs: Concerns Regarding Abuse and Death in Certain Programs for Troubled Youth*, GAO-08-146T (Washington, D.C.: Oct. 10, 2007) and *Residential Programs: Selected Cases of Death, Abuse, and Deceptive Marketing*, GAO-08-713T (Washington, D.C.: Apr. 24, 2008).

GAO-09-719T

instances where students with disabilities were abusively pinned to the floor for hours at a time, handcuffed, locked in closets, and subjected to other traumatizing acts of violence. Just a few weeks ago, the Council of Parent Attorneys and Advocates, an organization that works to protect the civil rights of children with disabilities, issued a report describing similar examples of injury and abuse. In some of the cases described in these reports, the restraints and seclusions resulted in death.

Given these prior reports and testimony, you asked us to (1) provide an overview of federal and state laws related to the use of restraints and seclusions in public and private schools; (2) verify whether allegations of student death and abuse from the use of these techniques are widespread; and (3) examine the facts and circumstances surrounding selected criminal, civil, or administrative cases where a student died or suffered abuse as a result of being secluded or restrained.

To conduct our work, we first searched for all federal and state laws pertaining to the use of seclusions and restraints in public and private schools. To verify whether allegations of student death, injury, and abuse from the use of these techniques are widespread, we gathered available data on allegations made over the last two decades by interviewing relevant experts and officials from state agencies; performing extensive Internet and LexisNexis searches; reviewing federal and state court documents related to civil and criminal litigation; and seeking leads from state investigators, agency officials, attorneys, and parent advocacy groups. Except for the case studies discussed below, we did not attempt to verify the facts related to the allegations we reviewed, nor did we attempt to evaluate cases where the use of restraints and seclusions may have been necessary or beneficial.

To select our case studies, we searched for restraint and seclusion cases from the last two decades in which there was a criminal conviction, finding of civil or administrative liability, or a large financial settlement. As part of the selection process, we focused on cases involving children from public and private schools or treatment programs in which residents attended classes; we excluded cases involving children in psychiatric facilities or juvenile detention centers. Ultimately, we selected 10 cases from 9 different states for further review. To the extent possible, we conducted interviews with related parties, including current and former school staff and officials, attorneys and law enforcement officials, and the parents of the victims. We also attempted to obtain training policies on restraints and seclusions followed at each school and treatment center involved in the cases. Further, where applicable, we reviewed police

reports; witness statements; autopsy reports; state agency oversight reviews and investigations; and court documents, including trial transcripts, depositions, and plaintiffs' complaints and defendants' answers. We also conducted searches to determine whether the individuals who restrained or secluded the children in our case studies had previous criminal histories and whether they are still teaching or working with children. Finally, in addition to the 10 new cases we selected for this testimony, we also included 3 cases involving the use of face down restraints from our previous work on residential treatment programs for troubled youth. We performed our work from February 2009 to April 2009 in accordance with standards prescribed by the Council of Inspectors General for Integrity and Efficiency (CIGIE).

## Overview of Federal and State Laws Related to the Use of Restraints and Seclusions

Overall, we found no federal regulations related to seclusions and restraints in public and private schools and widely divergent laws at the state level. We also identified at least five states that currently collect and report information related to the use of seclusions and restraints in public and private schools.

At the federal level, the Children's Health Act of 2000 amended Title V of the Public Health Service Act to regulate the use of restraints and seclusions on residents of certain hospitals and health care facilities that receive any type of federal funds as well as on children in certain residential, non-medical, community-based facilities that receive funds under the Public Health Service Act. CMS has issued additional regulations regarding the use of restraints and seclusions on patients of hospitals that participate in the Medicare and Medicaid programs. However, there are no federal laws restricting the use of restraints and seclusion in public or private schools. With regard to children with disabilities, the Individuals with Disabilities Education Act (IDEA) requires that eligible students be educated in the least restrictive environment. IDEA also mandates that special education students have an Individualized Education Program (IEP), a written document that in part explains the educational goals of the student and the types of services to be provided. IEPs are developed by parents and school personnel and may contain instructions related to the use of strategies to support the student. These could include, for example, instruction approaches and behavioral interventions such as the use of seclusion and restraints.

GAO-09-719T

Furthermore, state laws and regulations in this area vary widely. For example, nineteen states have no laws or regulations related to the use of seclusions or restraints in schools.[4] Other states have regulations, but they may only apply to selected schools in certain situations. For example, seven states place some restrictions of the use of restraints, but do not regulate seclusions.[5] Seventeen states require that selected staff receive training before being permitted to restrain children.[6] Thirteen states require schools to obtain consent prior to using foreseeable or non-emergency physical restraints,[7] while nineteen require parents to be notified after restraints have been used.[8] Two states require annual reporting on the use of restraints.[9] Eight states specifically prohibit the use of prone restraints or restraints that impede a child's ability to breathe.[10] For an overview of applicable seclusion and restraint laws and regulations in all fifty states and the District of Columbia, see appendix 1. In addition to these legal requirements, we found at least four states that are currently collecting and reporting information from school districts on the use of restraints and seclusions, including Kansas, Pennsylvania, Texas, and Rhode Island.

---

[4] Arizona, Florida, Georgia, Idaho, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Nebraska, New Jersey, North Dakota, Oklahoma, South Carolina, South Dakota, Vermont, Wisconsin, and Wyoming.

[5] Alaska, Colorado, Hawaii, Michigan, Ohio, Utah, and Virginia.

[6] California, Colorado, Connecticut, Illinois, Iowa , Maine, Maryland, Massachusetts, Nevada, New Hampshire, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Texas, and Virginia.

[7] Colorado, Delaware, Maryland, Massachusetts, Montana, New Hampshire, New York, North Carolina, Oregon, Pennsylvania, Tennessee, Virginia, and Washington.

[8] California, Colorado, Connecticut, Illinois, Iowa, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Tennessee, Texas, and Virginia.

[9] California and Connecticut.

[10] Colorado, Connecticut, Iowa, Massachusetts, Pennsylvania, Rhode Island, Tennessee, and Washington.

## Allegations of Death and Abuse Related to the Use of Seclusions and Restraints at Public and Private Schools

Although we could not determine whether allegations of death and abuse were widespread, we did discover hundreds of such allegations at public and private schools across the nation between the years 1990 and 2009.[11] Almost all of the allegations we identified involved children with disabilities.[12] While this number represents a small share of all children in public and private schools nationwide over these years, these allegations raise serious issues for a significant number of children, families, and those entrusted with their education and care. Although we continue to receive new allegations from parents and advocacy groups, we could not locate a single Web site, federal agency, or other entity that collects comprehensive information on this issue. For example, the Department of Education's Office of Civil Rights receives complaints about the inappropriate use of restraint and seclusion on children with disabilities, but officials said their case management system does not have the ability to single such complaints out for tabulation. In addition, the Department of Health and Human Services funds the collection of information about investigations conducted by state child protective services agencies through the National Child Abuse and Neglect Data System, but it does not have a code to indicate whether perpetrators are teachers or staff at public and private schools.

It is important to emphasize that allegations should not be confused with proof of actual abuse. However, in terms of meeting our objective, the hundreds of allegations we found came from a number of sources, including our own research, advocacy groups, news accounts, parents, and attorneys. We often identified multiple allegations from each of our sources; for example, an attorney based in South Carolina said his office has worked on at least 15 school cases involving the restraint and seclusion of children during the last 3 years, including a student's being shut in a classroom closet. Other examples of death and abuse claims are as follows; we do not know the outcomes of these cases.

- A 13-year-old boy with attention deficit hyperactivity disorder at an alternative public school hung himself in a seclusion room weeks after threatening to commit suicide, using a cord a teacher reportedly provided him to hold up his pants.

---

[11] There is likely a small percentage of overlapping allegations given our inability to reconcile information from the sources we used.

[12] For the purposes of this report, our definition of students with disabilities does not indicate eligibility under IDEA.

GAO-09-719T

- A 7-year-old girl died at a private day treatment center after being held for hours in a face-down, or prone, restraint on the floor by multiple staff members. The staff was allegedly unaware she had stopped breathing until they rolled her limp body over and discovered she had begun to turn blue.

- A 9-year-old boy in foster care died at a public charter school after his teacher took him to a "time out" room and restrained him using a "basket hold," which in this case was described as an adult standing behind a child, holding the child's crossed arms and taking him to the floor. Purportedly, the boy began to make a noise like he was vomiting, then slumped over after being released. The teacher testified that she initially thought he was playing dead and joked with other staffers about planning his funeral.

- A 17-year-old boy reportedly died from an asthma attack while being restrained by a counselor at a private school for emotionally disturbed teens.

- Disabled children as young as 6 years old were allegedly placed in strangleholds, restrained for extended periods of time, confined to dark rooms, prevented from using the restroom causing them to urinate on themselves, and tethered to ropes in one public school district.

- A special education teacher at a public school was accused of using bungee cords and duct tape to fasten children as young as 5 years old to chairs designed to support kids with muscular difficulties. According to parents, their children sustained injuries such as broken arms and bloody noses while in this teacher's class. A teacher's aide told investigators that the woman used the restraints on a daily basis to punish the children.

- According to the father of an 8-year-old autistic boy, his son suffered from scratches, bruises and a broken nose after being put in a prone restraint by his public school teacher and aide.

- A sixth-grade special education student reportedly had his leg broken by the public school teacher who was trying to restrain him.

- A 12-year-old girl allegedly had her arm fractured by a special education teacher who put her in a "therapeutic hold," described as being similar to a "bear hug" or hold a student's arms behind their back.

- An autistic student at a public school claims he was strapped with his pants pulled down onto a toilet training chair for hours at a time over several days.

In addition, we were able to obtain data showing that thousands of public and private school students were restrained or secluded during the last academic year. These data do not show the inappropriate use of restraints and seclusions, but rather the number of times the techniques were used during an academic year. Specifically, Texas and California, two states that together contain more than 20 percent of the nation's children, collect self-reported information from school officials on the use of these methods. Texas public school officials stated they restrained 4,202 students 18,741 times during the September 2007 through June 2008 academic year. During the same time period, California officials reported 14,354 instances of students' being subjected to restraint, seclusion or other undefined "emergency interventions" in public and private schools. Other states that currently collect and report this type of information include Kansas, Pennsylvania, and Rhode Island, but we did not obtain data from these states.

## Cases of Death and Abuse Related to the Use of Restraints and Seclusions

Children, especially those with disabilities, are reportedly being restrained and secluded in public and private schools and other facilities, sometimes resulting in injury and death. The 10 closed cases we examined illustrate the following themes: (1) children with disabilities were sometimes restrained and secluded even when they did not appear to be physically aggressive and their parents did not give consent; (2) facedown or other restraints that block air to the lungs can be deadly; (3) teachers and staff in these cases were often not trained in the use of restraints and techniques; and (4) teachers and staff from these cases continue to be employed as educators. In addition to the 10 cases we identified for this testimony, 3 cases from our previous testimonies on residential treatment programs for troubled youth also show that face down restraints, or those that impede respiration, can be deadly.

## Case Studies from Current Investigation

For our current investigation, we identified 10 seclusion and restraint cases occurring at public and private schools and selected treatment centers over the past two decades. Common themes related to the cases studies are as follows:

**Children with Disabilities:** Although we did not specifically limit the scope of our investigation to incidents involving disabled children, most of

the hundreds of allegations we identified related to children with disabilities. In addition, 9 of our 10 closed cases involve children with disabilities or a history of troubled behavior. The children in these cases were diagnosed with autism or other conditions, including post traumatic stress disorder and attention deficit hyperactivity disorder. Although we did not evaluate whether the seclusion and restraint used by the staff in our cases was proper under applicable state laws, we did observe that the children in the cases were restrained or secluded as disciplinary measures, even when their behavior did not appear to be physically aggressive. For example, teachers restrained a 4 year old with cerebral palsy in a device that resembled a miniature electric chair because she was reportedly being "uncooperative." In other cases, we found that teachers and other staff did not have parental consent prior to using restraints and seclusions. For example, an IEP for a 9 year old with learning disabilities specified that placement in a timeout room could be used to correct inappropriate behavior, but only as a last resort. However, teachers confined this child to a small, dirty room 75 times over the course of 6 months for offenses such as whistling, slouching, and hand waving. Parents in another case gave a teacher explicit instructions to stop restraining their 7-year-old child and secluding her for prolonged periods of time. Despite these instructions, the restraints and seclusions continued. In another case, a residential day school implemented a behavior plan, without parental consent, that included confining an 11-year-old autistic child to his room for extended periods of time, restricting his food, and using physical restraints. The child was diagnosed with post traumatic stress disorder as a result of this treatment. Currently, thirteen states require schools to obtain consent prior to using foreseeable or non-emergency physical restraints.[13]

**Death from Face Down Restraints or Restraints that Block the Airway:** Of the hundreds of allegations we identified, at least 20 involved restraints that resulted in death. Of the 10 closed cases we examined, 4 involved children who died as a result of being restrained. In all 4 cases, staff members used restraint techniques that restricted the flow of air to the child's lungs. In one of these cases, an aide sat on top of a child to prevent him from being disruptive and ultimately smothered him. The other cases related to the use of different types of prone restraints, a technique that typically involves one or more staff members holding a child face down on the floor. Although some of the teachers and staff

---

[13] Colorado, Delaware, Maryland, Massachusetts, Montana, New Hampshire, New York, North Carolina, Oregon, Pennsylvania, Tennessee, Virginia, and Washington.

involved in these cases were trained on the use of prone restraints, the children in their care still died as a result of its use. However, we did not attempt to evaluate the types of training they received or whether they actually implemented the procedure according to the training. Currently, eight states specifically prohibit the use of prone restraints or restraints that impede a child's ability to breathe.[14]

**Untrained Staff:** Although we did not evaluate specific training methods, evidence we gathered suggests that the teachers and other staff involved in our 10 closed cases were often not trained in the use of restraints. For example, staff involved in the death of a child in one case acknowledged that they were inadequately trained. A principal in another case testified that she did not know whether a substitute teacher who taped children to their chairs to make them sit still had ever been provided with the school policy on restraint. A local school board in a fourth case was found civilly liable for negligently supervising and training teachers after a 4-year-old girl was strapped to a chair for allegedly being uncooperative. A school district agreed to implement policy changes to improve training in a fifth case as part of a settlement agreement after a teacher repeatedly restrained a frail 7 year old. Lastly, in a sixth case, a volunteer teacher's aid with a history of armed burglary and cocaine possession was allowed to tape first graders to a blackboard and seal their mouths shut; we found no evidence that the school trained this aide or even conducted a background check on her before letting her into the classroom. Currently, seventeen states require that staff receive training before being permitted to restrain children.[15]

**Continued Employment in Education:** Although we did not evaluate specific state licensing requirements, we did observe that in at least 5 of our cases, the teachers or other staff involved in the injurious restraint or seclusion of children continued to work with students or had licenses to do so. For example, a 230 pound teacher in Texas who fatally restrained a 129 pound teenage boy facedown on a mat currently works as a public high school teacher in Virginia. The Texas Department of Family Protective Services (DFPS) placed the teacher's name on a Texas registry

---

[14] Colorado, Connecticut, Iowa, Massachusetts, Pennsylvania, Rhode Island, Tennessee, and Washington.

[15] California, Colorado, Connecticut, Illinois, Iowa , Maine, Maryland, Massachusetts, Nevada, New Hampshire, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Texas, and Virginia.

GAO-09-719T

that lists individuals found to have abused or neglected children. An administrative law judge later ruled that the woman used unnecessary force on the special education student, sustained the DFPS's abuse finding, and affirmed that the teacher's information should be released through the registry. Despite this listing, she is currently licensed in Virginia to instruct children with disabilities. In another example, the assistant principal who fatally restrained a child after holding him facedown on the floor for approximately an hour currently works as a principal at another public school in the same district. In addition, one of the teachers who strapped the 4-year-old child to a chair for allegedly being uncooperative still teaches at the school where the incident occurred, while the teacher who repeatedly restrained the frail 7 year old left her school but immediately began teaching in another district in the same state. Finally, the substitute teacher who taped children to their chairs and was found guilty of unlawful restraint and battery in July 2008 still holds a state substitute teaching certificate, which does not expire until June 2009.

Table 1 provides a summary of the cases we examined; a more detailed narrative on each of the cases follows the table.

**Table 1: Summary of Case Studies**

| Case | Student information | Location and type of institution | Year of incident(s) | Case details |
|------|--------------------|--------------------------------|--------------------|--------------|
| 1 | Male, 14, had a history of disruptive behavior | Pennsylvania; private, nonprofit residential treatment center | 1998 | • Two staff members trained in the use of restraints pinned the student facedown on the floor for 20 minutes after he tried to attack a counselor.<br>• Student died from a brain injury as a result of a lack of oxygen.<br>• Death ruled an accident and no criminal charges were filed.<br>• Facility settled with student's mother for over $1 million with no admission of liability.<br>• Pennsylvania banned prone restraints in 2008. |
| 2 | Male, 14, diagnosed with post traumatic stress and other disorders | Texas; public school | 2002 | • 230 lb. special education teacher placed 129 lb. student into a prone restraint and lay on top of him because he would not stay seated.<br>• Student died as a result of compression of the trunk.<br>• Death ruled a homicide, but no criminal charges filed.<br>• Teacher currently teaches in Virginia and is licensed to instruct children with disabilities. |

| Case | Student information | Location and type of institution | Year of incident(s) | Case details |
|------|---------------------|----------------------------------|---------------------|--------------|
| 3 | Male, from the age of 11 through 13, diagnosed as mentally retarded and autistic | New York; private residential school and state facility for children with developmental disabilities | 2004 and 2007 | • Case involves two residential facilities<br>• Without notifying parents, child "ignored" and secluded in his room for extended periods of time at first facility and had access to regular meals restricted.<br>• Parents removed child from the school alleging neglect; case resulted in state law granting parents full access to investigative records in abuse cases.<br>• At second facility, student died by suffocation after an aide sat on top of him because he was being disruptive while riding in a van.<br>• The aide and driver of the van stopped at a game store and one of the employee's houses while the child lay unconscious in the backseat.<br>• The aide was convicted of manslaughter and is currently in prison. |
| 4 | Male, 15, diagnosed as autistic | Michigan , public school | 2003 | • Student suffered a seizure and lost control of his extremities and bladder and later became uncooperative.<br>• Assistant principal and other staff did not provide medical attention for the seizure and instead placed student in a prone restraint for approximately an hour, resulting in death.<br>• Death ruled an accident and no criminal charges filed.<br>• Mother settled a civil suit with the school district for $1.3 million.<br>• Assistant principal is now a principal at another school in the district. |
| 5 | Female, 4, born with cerebral palsy and diagnosed as autistic | West Virginia; public school | 1998 | • Child was "uncooperative," so teachers restrained her in a chair with multiple leather straps that resembled a "miniature electric chair."<br>• Child suffered bruising, wet the bed, and had temper tantrums. Doctor later diagnosed child with post traumatic stress syndrome.<br>• Jury in civil case did not find teachers liable for any wrongdoing but found school board liable for negligent supervision and training in the use of restraints and awarded the family $460,000.<br>• West Virginia has since banned the use of restraints on pre-kindergarten children.<br>• At least one of the three teachers responsible for the restraint still teaches at the school. |

GAO-09-719T

| Case | Student information | Location and type of institution | Year of incident(s) | Case details |
|------|---------------------|----------------------------------|---------------------|--------------|
| 6 | Four males under 6, all in special education class and one diagnosed with a condition similar to Down syndrome. | Tennessee public school | 2003 to 2004 | • To prevent a child with a Down syndrome-type condition from wandering, the teacher used sheets to strap the boy to a cot while he was wearing a 5lb., lead physical therapy vest.<br>• The teacher also hit the children with a flyswatter, a ruler, and her hand.<br>• Teacher pleaded guilty to felony child abuse, neglect, and misdemeanor assault and was placed on 3 years probation. |
| 7 | Male, 8, diagnosed with attention deficit hyperactivity disorder | Illinois public school | 2006 | • Substitute restrained child to a chair with masking tape and also taped his mouth shut because the boy would not remain seated.<br>• Substitute found guilty of unlawful restraint and aggravated battery. He was sentenced to 2 years probation, community service, and a psychological evaluation.<br>• Substitute still possesses an Illinois substitute teaching certificate, which expires in June 2009. |
| 8 | Five students, gender not disclosed, aged 6 and 7 | Florida public school | 2003 | • Volunteer teacher's aide, a felon on probation for armed burglary, grand theft and cocaine possession, gagged and duct-taped children to their desks as punishment for misbehaving.<br>• There is no record that the school trained aide or conducted a background check before allowing aide into the class room.<br>• Aide pled guilty to false imprisonment and battery, was placed on 5 years probation, and ordered to attend anger management classes.<br>• Aide was later arrested again for possession of cocaine. |
| 9 | Female, 7, diagnosed with Asperger's syndrome, a form of autism | California public school | 2001 to 2002 | • Teacher secluded child in a walled off area because she refused to do work, sat on top of her because she was wiggling a loose tooth, and repeatedly restrained and abused her.<br>• The student was awarded $260,000 in a civil settlement, although the school and teacher did not admit liability.<br>• Teacher left the school but began teaching again in a different school district. |

| Case | Student information | Location and type of institution | Year of incident(s) | Case details |
|------|---------------------|----------------------------------|---------------------|--------------|
| 10 | Male, 9, diagnosed with a learning disability | New York public school | 1992 to 1993 | • School was only supposed to use timeout room as a last resort to correct inappropriate behavior but put child in the room 75 times over a 6 month period for hours at a time for offenses such as whistling, slouching, and hand waving. |
| | | | | • The room was unlocked, but a staff person would hold it shut to prevent the child from leaving; the child's hands became blistered while trying to escape. |
| | | | | • Mother reported that the room was dirty and smelled of urine. |
| | | | | • A jury in a civil suit awarded family $75,000: $1,000 for every time the child was placed in the room. |

Source: Records including police reports, court documents, and interviews.

**Case 1:** The student was a 14 year old male. He was living in a private, non-profit, residential treatment center for troubled children in Pennsylvania and attending a private school operated by the center when he died in 1998 as a result of being physically restrained. He had been placed in the custody of the non-profit by the New Jersey Department of Youth and Family Services in 1995.

According to a report by the District Attorney, on December 10, 1998, following a fight with a fellow student at a school on the treatment center's campus, the 14 year old returned to his dormitory room. A 195 pound male counselor entered the room to counsel the 125 pound boy about the fight. The boy was agitated and attempted to stab the counselor at least three times with a pen. To prevent further attack, the counselor applied a prone restraint in which the boy ended up face down on the floor with the counselor's left knee on the left side of his body and the counselor's right leg across his back. At this point, the boy no longer had the pen in his hand. The counselor locked the boy's arms behind his back. A female counselor heard the boy say, "I'm sorry I hit you" and "I hate you all." While being physically restrained on the floor, the boy continued to yell, kick, and struggle. A 155 pound male counselor also entered the room and placed a vinyl mat under the boy's head to prevent injury. The treatment center's records reveal that the boy had previously been physically restrained 17 times. The treatment center would not release the boy's treatment plan.

After approximately 12 minutes, the 195 pound counselor became tired and the 155 pound counselor took his place, locking the boy's arms behind the boy's back and positioning his body so that it lay off to the left side of

the boy. The 155 pound counselor physically restrained the boy for approximately 8 minutes during which time the boy continued to struggle and scream "Get the [expletive] off me, get off me." Another child reported hearing the boy yell, "Stop it, I can't breathe." The 195 pound counselor responded, "You'll be able to breathe if you stop struggling." After approximately 20 minutes of physical restraint, the student lost consciousness, and CPR was administered. The boy was taken to the hospital where he died a day later. The autopsy determined the cause of death as hypoxic encephalopathy due to compressional asphyxia, a brain injury sustained as a result of lack of oxygen due to the compression of the student's chest.

Each of the counselors who applied the restraint that led to the boy's death were trained and certified in applying physical restraints. According to an instruction manual, employees at the center were trained in applying multiple restraints, two of which required the student to remain face down on the floor in a prone position. In his report, the District Attorney concluded that the treatment center's policy did not appear to have any inherent flaw in the technique and that the policy was well designed and appeared to have been followed by all the counselors involved. The coroner ruled that the death was accidental and the District Attorney did not file charges against the counselors.

In May 1999, the boy's mother sued the treatment center and two of the counselors who applied the restraint that led to the boy's death, alleging negligence. She claimed that the counselors used excessive force, and that the treatment center did not adequately train their counselors to deal with respiratory distress during a physical restraint. The defendants denied these allegations and said the restraint was employed for the protection of everyone involved in the situation. The counselors further stated that they acted with due care and safety of the boy.

In May 2006, before the case went to trial, the boy's mother, the treatment center, and the two counselors reached a settlement. According to the terms of the settlement, the boy's mother would be paid over $1 million. The treatment center and the two counselors did not admit any liability in the boy's death as part of this settlement. The two counselors who physically restrained the boy did not have criminal histories. They no longer work at the treatment center, but we were unable to determine whether they currently counsel children.

In October 1999, less than a year after the boy's death, the Pennsylvania Department of Public Welfare enacted regulations that prohibit child

residential facilities and day treatment centers from administering restraints that apply pressure or weight on a child's respiratory system. Consequently, we requested the treatment center provide its current policies and training manuals regarding restraints. In response, the treatment center sent us a letter stating it no longer uses prone restraints. In addition, it provided us a copy of its policy allowing physical restraints in residential treatment facilities and education programs and a workbook used to obtain certification in physical restraints. The center's policy states trained staff members are authorized to use physical restraint methods. According to the workbook, staff can apply physical force that reduces or restricts mobility while an individual is in an upright or seated position, lying face up, or in the transport of an individual from one location to another.

**Case 2:** The victim was a 14-year-old male who died in 2002 from being restrained by his middle school teacher at a public school in Texas. He was taken from his family at the age of nine after the Texas Department of Family and Protective Services (TDFPS)[16] received reports that the boy and his siblings were being neglected and emotionally and physically abused, according to his foster care records. He described having to feed himself by taking food from trash cans and grocery stores. He was placed in his last foster home after being hit in the head with a shovel at the residential treatment center where he resided. Less than a year before he died, he told his therapist that his idea of a safe place was a cave with solid rock walls, a steel door, and lots of food. His most recent psychological assessment noted that the boy suffered from posttraumatic stress disorder, conduct disorder, oppositional defiance disorder, attention deficit hyperactivity disorder, and narcissistic personality disorder. The child also had a fear of not being allowed to eat and often horded food as a result of his prior abuse, according to TDFPS. The boy was in a special education class that focused on behavior management. We were unable to obtain the child's individual education plan.

The day the child died, he had been denied his lunch by school staff as a form of punishment, according to an investigation by TDFPS. Reports differ on what prompted this disciplinary action. The classroom teacher told police she gave him a "delayed lunch" because he had stopped working at about 11 a.m. and started asking if he could eat. She said this

---

[16] At the time, this department was called the Department of Protective and Regulatory Services.

was a common occurrence. A teacher's aide also told police that he placed the child on "delayed lunch" at about 1 p.m. after the boy tried to steal candy. The child became agitated at about 2:30 p.m. and left the classroom, according to TDFPS. The aide ran after the boy and brought him back to the classroom, but he would not remain seated. The teacher warned him to sit down at least twice before forcibly placing him in his chair. She told police that she used a "basket hold" restraint on him while he remained seated, standing behind him and grabbing his wrists so his arms crossed over his torso. He continued to struggle, so the teacher told police she rolled him onto a mat face down into a "therapeutic floor hold" and lay on top of him. A student said his arms were pinned beneath him. The child was 5 feet 1 inch tall and weighed 129 pounds. The teacher was about 6 feet tall and weighed in excess of 230 pounds. An aide, meanwhile, held the boy's feet. The boy kicked and cursed. He repeatedly said that he could not breathe and that he was going to pass out. Multiple witnesses told investigators that he also said, "I give." After the boy became silent, the teacher continued to restrain him. An assistant principal who had entered the classroom while the boy was still struggling asked the teacher to release him, saying 15 minutes had passed. School district policy required administrator approval for extending restraint past this time period. The teacher and an aide put the child's limp body back in his chair, and the aide wiped drool from his mouth. The assistant principal told police that they thought he had been "playing possum." Once the assistant principal noticed that the child was unresponsive, she said she asked for the school nurse. The nurse arrived and performed CPR while someone phoned 911. The child was taken to the hospital and pronounced dead. A dozen students in the classroom had witnessed the incident.

Medical examiners performed an autopsy and determined that the boy died from mechanical compression of the trunk. His death was ruled a homicide and local police investigated the incident for possible prosecution. During the investigation, the teacher told authorities that the school district trained her on how to restrain students. School policy stated that restraint can be used if the child is an immediate danger to himself or others or if the child is trying to exit the classroom with the intent to leave school premises. One school district restraint trainer told police that the teacher had a very difficult classroom—the worst in the district. She also said she had reviewed the teacher's previous "therapeutic floor holds" and found no problems with the way the teacher executed the procedure.

A grand jury decided not to take action on the boy's death. TDFPS launched their own investigation and found "reason to believe" the teacher

physically abused the student on the day he died. TDFPS placed her name on the department's "Central Registry," which lists individuals found to have abused or neglected children. The teacher appealed the listing to the State Office of Administrative Hearings. An administrative law judge found that the child's actions prior to being restrained did not put himself or anyone else in danger. The judge also determined that the boy had already been returned to the classroom uneventfully. The judge also found that the teacher employed the restraint as an inappropriate disciplinary tactic, using excessive, unnecessary force out of proportion to the minimal risk posed by the child's action. The teacher also ignored pleas and warnings that the child could not breathe and continued to hold him after he became still and quiet, the judge noted. Under these circumstances, the judge determined the teacher's action to be reckless and the child's death not an accident. The judge sustained the department's abuse finding and allowed the information to continue to be released to upon request to officials responsible for children. The teacher does not have a criminal record and currently works as a teacher at a public high school in Virginia. Her Virginia teaching license lists endorsements for the instruction of students in grades K-12 who have specific learning disabilities, emotional disturbances and mental retardation. We have referred this matter to the Virginia Department of Education for further investigation.

**Case 3:** The student was 11 when he was first abused at a private facility in New York before being smothered to death 2 years later by an employee at a state facility who restrained him in a van. The child was non-verbal and had been diagnosed as mentally retarded and autistic.

In January 2003, the family enrolled the child at a private, nonprofit residential school paid for by Medicaid. According to his parents, they were struggling to toilet train their son and had heard the school had been very successful with these situations. Initially, he appeared to be doing well, successfully using the toilet about 50 percent of the time. In the summer and fall of 2004, the boy became increasingly more aggressive and began sporadically taking off his clothes. Without parental notification or consent, the school implemented an adjusted behavioral support plan,[17] called "planned ignore." As part of this plan, the child had restrictions placed on his access to regular meals. According to school documents, he

---

[17] The school implements a Behavior Support Plan in response to maladaptive and defiant behaviors by residents. The plan attempts to address and manage these behaviors; to foster more positive, appropriate, and pro-social behavior; and to ensure the safety of the residents and their peers.

was required to be dressed in order to eat his meals. If he did not get dressed after one prompt from the staff, he was not allowed to eat his meal and received only yogurt, milk, juice or water for breakfast, lunch, and dinner. State investigations subsequently found that in a 1 month timeframe, the child missed almost 40 percent of his regular meals. When the child refused to get dressed, he also was secluded in his room for extended periods of time, while an employee held the door closed. The child's isolation prevented him from participating in meals, school, and leisure activities. One staff member described the school's protocol for the student as "putting him in a dark hole and giving him nothing." During this time he missed approximately 2 weeks of classes. The school also suspended the family's visitation rights.

In October 2004, the father said he found his son disoriented and lying naked in his own urine. The window in his son's room was taped, pictures and toys had been removed and his son, noticeably thinner, was covered in bruises. Although the parents had not consented to any form of restraint being used against their son, school injury reports confirm that the staff did use physical restraint. The reports cite bruising and scrapes over the student's entire body, documenting the bruises as "too numerous to count." As a result, the parents removed their son from the school and took him home. The parents said their son seemed "emotionally damaged" and according to his psychiatrist, was suffering from post traumatic stress disorder.

As a result of allegations by the family, several New York state agencies and the district attorney's office initiated investigations of the abuse and of the school's regulatory compliance. Although the school was required to correct deficiencies of care identified in these investigations, no actions were taken against any of the staff involved in the incidents, and we were unable to determine whether the staff members are still working at the school. The parents then filed a complaint with the New York State Inspector General (IG) asking that it review the quality of the agencies' investigations. The IG ultimately found deficiencies related to each investigation and recommended, in part, that the relevant state agencies take steps to ensure that abuse cases are investigated thoroughly. The IG report further stated that there is no justification for a child in a private, state-certified facility to be afforded less protection from abuse than a child in a state run facility. In addition, the child's family worked to pass a state law, named in their son's honor, requiring parents or guardians to be notified within 24 hours of an incident that affects the health and safety of their child. The law, which became effective in 2007, also grants parents and guardians full access to records relevant to investigations of patient

abuse and increases fines for state licensed facilities that do not comply with applicable rules and regulations.

Unfortunately, before this law was passed, the family suffered an even greater tragedy. In the fall of 2005, their son's emotional problems escalated. He was experiencing rages and, after several trips and weeks spent in the hospital, the family could still not stabilize his behavior. In October 2005, the child was transferred from an upstate New York hospital and placed in a state-operated facility for children with developmental disabilities.

Sixteen months later, the child was on a field trip when he began acting up and was smothered to death by one of the school's health aides. Police records indicate that during the van ride, the child got out of his seatbelt and began grabbing at another student. According to his parents, their son's behavior plan included the use of a seatbelt buckle guard, a device that prevents the wearer from disengaging the buckle. However, to their knowledge the buckle guard allegedly was not being used that day. Instead, one of the health aides got in the back seat of the van and first tried to restrain the child by pulling his arm's across his chest while he was in a seated wrap position. When that did not calm the child, the aide sat on the child. .. Although the family had consented to the use of some restraints against their son, this improper restraint caused the child to lose consciousness and stop breathing.

After the child fell unconscious, neither of the employees in the van performed CPR or first aid. Instead they continued to drive around, stopping at a game store and one of the employee's houses before finally going back to the school. In a statement made to police, the aide said "[he] realized that [the child] had stopped breathing when he stopped moving" but didn't call anyone for help because he and the other aide were afraid of losing their jobs and going to jail. The child had been unconscious for over 30 minutes when CPR rescue efforts first began. The autopsy report cites the cause of death as cardiorespiratory arrest due to compressive asphyxia. The aide responsible for smothering the child was convicted of second degree manslaughter and is scheduled to be released from prison in 2012.

**Case 4:** This 15-year-old male died on the first day of school in August 2003 after being restrained by staff at a Michigan public high school. The student had been previously diagnosed with autism and had an Individual Education Plan (IEP) signed by his mother that summer which stated that his disability affected his ability to perform socially or academically at his

grade level. The plan described him as being inquisitive, artistic and motivated to please. It also stated that the boy enjoyed verbal praise and positive adult attention.

On the day of his death, an aide accompanied the student to a choir class with approximately 20 other students. In addition to the student, there was one other autistic student and three special education students. About 15 to 20 minutes into the class, the student's eyes rolled back into his head, his body began to convulse, and he lost control of his bladder. The aide stated that she believed the student was having a seizure. She placed the student on the floor and after several minutes, another aide pressed the room's emergency button. The school's assistant principal responded to the classroom and decided that the student did not need medical attention. He instructed another staff member to call the student's mother to pick him up.

Approximately 10 minutes after the seizure, the student got up but seemed unsteady so the instructional aide tried to assist him into a seated position. At this point, the student jumped up and began flailing his arms. The choir teacher, who had moved her students to another part of the room to continue the class, made another call for assistance and the assistant principal returned, this time accompanied by another aide. Shortly thereafter, the student began to scream and flail his arms again. According to the assistant principal's written statement, he believed that the student might hurt himself or others, so he and the two aides placed the student in a full restraint facedown on the floor. Specifically, the assistant principal was holding the student's arms behind his back, one of the aides held his legs down, and the other was holding his shoulders. The assistant principal went on to state that it was very difficult to hold onto the student and that every time they relaxed the restraint, he would begin to struggle again. They restrained him in this manner for approximately an hour, but did not call any medical professionals to attend to the student during this time.

The assistant principal and the aides eventually stopped the restraint when a man and woman who were friends of the mother arrived to pick the student up. The male friend tried to talk to the student but he did not respond. Both the assistant principal and the two friends thought the student looked strange and asked the school staff to call 911. The assistant principal checked the student and said he felt a pulse, but the female friend stated that he was not breathing. The assistant principal checked again for a pulse and found none, so the female friend started CPR. The assistant principal, who had an expired CPR certification, assisted by pinching the student's nose closed. Police and firefighters arrived and

GAO-09-719T

continued CPR for an additional 30 minutes until paramedics transported the student to a hospital, where he was pronounced dead. In the autopsy report, the medical examiner concluded that the student had suffered an apparent seizure and further wrote that "restraint in the prone position of emotionally and physically agitated individuals is recognized as being associated with sudden death, even without significant chest or neck compression." The official cause of death was listed as "prolonged physical restraint in prone position associated with extreme mental and motor agitation." His death was ruled an accident and no criminal charges were filed.

In 2006, the student's mother settled a civil case against the school district and the regional educational services agency for $1.3 million. In her deposition, the choir teacher stated that she had no idea the student was autistic until she saw him walk into the class with his aide and that she had no prior information on the student. In his deposition, the school's principal testified that neither he nor the assistant principal had received training about the dangers of restraining an individual on the floor. The aide who had held the student's feet to the floor also testified in a deposition that he was never given any advice or information on restraining students. Further, according to an instructor who had provided training that included the use of restraints to both the Regional Educational Service Agency (RESA) and school district staff testified, the instructional aide who accompanied the student into the class had last received such training in 1987. At the time of the incident, the instructor said that training, which includes the use of restraints, was offered to school district employees but the decision about who had to be trained was left to principals or program supervisors.

As of April 2009, the assistant principal who made the decision to restrain the student currently serves as the principal of the district's middle school and one of the other staff members who restrained the student is currently employed by the district's regional educational service agency. We were unable to determine whether the other staff members are still employed by this or any other school district. None of the staff members who restrained the child had any criminal histories.

As a result of this student's death, and another student death in 2003 caused by improper restraint, a member of the Michigan State Board of Education (SBE) told us that SBE changed its recommended policies on the use of restraints and seclusions. However, though the policy encourages local school districts to collect and report data on the use of these techniques to the Michigan Department of Education, the board

member expressed doubt that this was actually done. In each year since the policy was enacted, the member said that she has requested any statistics or reports on the use of seclusion and restraints but has never received any information.

**Case 5:** The child in this case was an adopted, 4-year-old female who was strapped to a chair by her teacher at a West Virginia public school. The child was born with cerebral palsy and was later diagnosed with autism. In February 1998, she started special education classes and shortly thereafter, began to have tantrums and wet her pants at school. According to the child's mother and, even though the child was toilet trained. Her mother also said that the girl began coming home from school with bruises covering her calves, chest, and wrists.

According to the school and teachers, after the girl was enrolled in school for just 10 days, her mother arrived at school to pick her up and was told by a teacher's aide that she was being uncooperative and had been restrained in a chair for medically fragile children. The mother later claimed that, because the child was autistic, she would act up when she needed to use the bathroom. The school and teachers stated that they put her in the chair because she was "uncooperative." According to the mother, the chair resembled an electric chair and was high backed with multiple leather straps across the arms, chest, lap, and legs. The mother told the school to never use the chair again.

That same day, the child's mother removed her daughter from the West Virginia Elementary School and reported the bruises and use of the restraint to the State Board of Education. When the Board provided no help, the mother sued the school district alleging, among other things, that the school's actions directly and proximately caused and will continue to cause her daughter great psychological and emotional stress, developmental delays, trauma, fears, and pain and suffering. The jury found that the defendants did not discriminate against the child, violate the child's constitutional rights, commit assault and battery against the child, or falsely imprison the child. However, the jury did find the school board liable for negligently supervising and training three teachers in the use of restraints, which proximately caused injury and awarded the mother and child $460,000 for mental pain and suffering and the mother's lost wages.

We contacted the school district to see if any corrective actions have been taken to prevent similar incidents from occurring. According to the

school's superintendent, the school district no longer uses restraints. Unrelated to the case, West Virginia also promulgated a state regulation stating that school personnel in a pre-kindergarten classroom may not restrain a child by any means other than a firm grasp around a child's arms or legs and only for as long as necessary.

According to the family's attorney, a doctor diagnosed the child with post traumatic stress disorder as a result of the restraint. Although she is now 15 years old, her mother says that she has still not returned to school and suffers anxiety when she sees a school or hears the word "teacher." In addition, she will not use public restrooms because she believes that it is wrong to urinate in public. At least one of three teachers responsible for restraining the child is still teaching in the same school.

**Case 6:** The four students, all males all under 6 years old, attended a special education class in a Tennessee public school, where they were assaulted and physically restrained by their teacher between early December 2003 and mid-March 2004. One of the children was diagnosed with a condition similar to Down syndrome, according to his parents.

The school had received complaints about the teacher after the 2002 to 2003 school year, prompting the Director of Special Education for the county to initiate an inquiry. As a result of these complaints, the school system developed a corrective action plan, which included installing a surveillance camera in the teacher's classroom, mentoring, and direct supervision by the school's Special Education Director.

Despite these corrective measures, the teacher's interactions with the children did not improve during the following school year. Specifically, to prevent the child from wandering, the teacher tied the child suffering from the Down syndrome type-condition to a cot with a sheet while he was wearing a 5 pound lead physical therapy vest, which was supposed to be used to help with the child's posture. The child's mother asked that school staff not restrain her son since it would be difficult to free him in the event of a fire. Despite her request, the teacher allegedly continued to restrain the boy, sometimes so tightly that a teacher's aide would spend 5 minutes or more trying to unravel the knots. In addition to the restraint there were claims that the teacher hit the children with a flyswatter, ruler, and her hand, according to a complaint filed with the Tennessee Department of Children's Services.

The Board of Education suspended the teacher in March 2004 and dismissed her in June 2004. In June 2005, a grand jury indicted the teacher

on 14 counts of child abuse and 14 counts of assault. The teacher, who had no prior criminal convictions, pled guilty to one count of felony child abuse and neglect and three counts of misdemeanor assault. In February 2007, according to the terms of her plea agreement, she was placed on 3 years of probation but did not serve any jail time. According to the assistant district attorney general who handled the case, it was challenging because state law requires proof that the children were harmed, such as pictures of bruises or statements from doctors and there was no such evidence. He also said that the teacher's guilty plea and subsequent felony conviction for child abuse guaranteed that she would never be able to teach again in Tennessee. Tennessee revoked her teaching license, but we were unable to determine whether she is teaching or otherwise interacting with children in any other state.

**Case 7:** An 8-year-old boy was restrained by a substitute teacher who used masking tape to strap him to a chair and seal his mouth at an Illinois public school in March 2006. The child, who was diagnosed with attention-deficit hyperactivity disorder, attended a special education class with up to eight other students with various emotional or physical disabilities.

On the day of the incident, the substitute told the 8 year old and another male student in the class that they would not be allowed to play during their free time and told them to draw at their desks. In a written statement, the substitute told police that he disciplined the boys because they were "acting up and causing problems." The substitute testified that the two boys still did not remain in their seats, so he told them to sit in their chairs and put their hands behind their backs, and then he wrapped masking tape around their arms. After the boys broke free, the substitute taped them again in the same manner. The substitute testified that the students were "laughing" so he placed tape over each of their mouths and returned his attention to the class. After the 8 year old began "mumbling," the substitute removed the tape from his mouth and the child told him "his arms hurt." In a hand-written note the substitute left for the class's regular teacher, he wrote "I hope I didn't do something wrong by masking taping [the boys] to their chairs for a couple minutes. They were laughing most of the time when I did it."

The 8 year old reported the incident to his after-school daycare provider, according to the Illinois Department of Children and Family Services (DCFS). DCFS coordinated its efforts with law enforcement as well as the county's victim advocacy center and the State's Attorney Office and a grand jury ultimately charged the substitute with two felony counts of unlawful restraint and two felony counts of aggravated battery. During the

trial, the school's principal testified that district policy allowed physical restraint in limited circumstances: to prevent students from harming themselves or damaging property or to remove a student who will not voluntarily leave an area. The principal also testified she did not know whether the substitute was ever given these policies.

A jury found the substitute guilty of one count of unlawful restraint and one count of aggravated battery in July 2008. The substitute was sentenced to 24 months probation, fined $1,500, perform 80 hours of community service, and undergo a psychological evaluation. The substitute still holds an Illinois state substitute teaching certificate that expires in June 2009. Prior to this incident, the substitute had been arrested in 2001 for driving under the influence of alcohol. He was sentenced to 18 months supervision and treatment for alcoholism, and fined $1,500.

Although this case was successfully prosecuted, individuals we interviewed from the State's Attorney Office and Equip for Equality (Illinois Protection and Advocacy Service) told us that seclusion and restraint cases involving children and adults with physical or mental disabilities typically have low rates of prosecution. The State's Attorney Office cited reasons such as the reluctance to further traumatize victims by having them testify, the stereotype that special needs children are unreliable witnesses, and sympathy for teachers and other staff seen as working with challenging individuals who might need to be secluded or restrained. In addition, Equip for Equality officials told us these incidents may also go underreported if children are not able to relate their experiences because they may be unable to communicate orally.

**Case 8:** The students were five first grade children restrained by a volunteer teacher's aide at a public elementary school in Florida in August and September 2003. The volunteer aide, who had a prior criminal record, was charged with child abuse and false imprisonment for using tape to restrain and gag her students as punishment for misbehavior.

The students, aged 6 and 7, were bound with tape in a variety of ways. The aide lashed their arms to their laps, tied their ankles together, strapped their bodies to their desks, fastened their heads to the blackboard and sealed their mouths shut. A portion of one child's hair was snatched off when the aide forcibly removed the tape. We could find no evidence to indicate that the school trained or conducted a background check on the aide, who was at the time a felon on probation for armed burglary, cocaine possession and grand theft.

After the students filed a complaint with the police, the aide surrendered and was charged with five felony counts of child abuse. She pled guilty to four counts of false imprisonment and one count of misdemeanor battery in January 2005 and was placed on 5 years probation, with the possibility of early termination of this probation after 2 and a half years and completion of all special release conditions, which included serving 75 hours of community service, taking classes in parenting and anger management, and having no contact with the students. Approximately a year later the aide was again arrested, this time for possession of cocaine and drug paraphernalia. A law enforcement officer witnessed her with a crack pipe.

**Case 9:** The student was a 7-year-old female enrolled in a special classroom at a public school in California when her teacher began secluding, restraining, and abusing her. The student, a small, frail girl weighing only 43 pounds, was diagnosed with Asperger's Syndrome, a form of autism characterized by language impairment and poor social skills.

According to the student's mother, the teacher secluded the girl in a walled off area in the back of the classroom accessible by only one door because she refused to do her school work. The mother alleged that when the teacher discovered that her daughter was wiggling a loose tooth, the teacher physically restrained her by making her lie face down on the floor and sitting on top of her. When the student came home from school that day, she complained to her mother, "Mommy, Mommy, my teacher hurt me, and I couldn't breathe." In June 2001, the student's mother sent a letter to the teacher instructing her to discontinue all physical restraints on her daughter. Despite these instructions, the parents alleged that restraint and other physical abuse continued. They also alleged that the girl was frequently left in seclusion for 3 hours at a time for refusing to do work. In December 2001, the parents met with the principal and the teacher and ordered the teacher to stop all physical restraints and prolonged seclusions, placing these instructions in the child's IEP.

The restraint and other mistreatment continued, according to the parents. In April 2002, the parents alleged that the teacher admitted to smearing the contents of a burrito all over the student's face and hair after she refused to eat. In July, the parents removed their daughter from the school after the teacher allegedly physically restrained her at least three times in one day during summer school. Furthermore, according to the parents' complaint, the teacher kicked the student, spun her around, and dropped her on her head. When her mother picked her up from school that day, the

child had a severe abrasion to her arm, a one-inch diameter bruise on her right shoulder, and a bump on the right side of her head. The student told her mother she was "hurt all day" by her teacher. The teacher later said she restrained the student because she was a danger to herself and others. Furthermore, the teacher said the student had threatened her by waving a pair of scissors at her. According to the teacher, while she was restraining the child, her arm gave out and the student fell to the floor, injuring herself. The school's principal stated that the teacher received training once a year in applying restraints. However, this was not the first time the teacher had been accused of physically mistreating a child. Prior to the July 2002 incident, the teacher was accused of using excessive force while restraining another child in her classroom. However, the teacher did not have any prior criminal convictions.

The student's family sued the teacher, multiple school officials, and the school district. At trial, the teacher and school's principal were found liable for negligence and civil rights violations and the school district was found liable for civil rights violations. The family was initially awarded $700,000 in damages. According to the student's attorney, to avoid an appeal by the school district, the family settled with the school district and school officials. As part of the settlement agreement, though, the school district and school officials did not admit any liability. The student's family was ultimately awarded $260,000. In addition, the parties agreed to a 2-year period of judicial oversight during which the school district would be required to institute policy changes related to the discipline and behavior management of special needs children in order to achieve the goals of training, supervision, and accountability.

The school officials involved with this case are no longer employed with the school district, according to the student's attorney. However, in October 2002, the teacher began teaching in a different school district, where she remained until June 2005. She currently holds a valid California state teaching license, but we were unable to determine if she is employed as a teacher. The student is now home-schooled and living in a different state. According to the student's mother, the girl has never fully recovered from her experience.

**Case 10:** The student was a 9-year-old male with a learning disability who was secluded in a time out room repeatedly while enrolled in second grade in a New York public school. As part of his educational plan, his mother agreed to an IEP to assist with his learning disability. The IEP specified that the school may put the child in a 'time-out' room to correct inappropriate behavior, but only as a last resort. However, school records

show that the student was placed in the time-out room regularly—75 times over a 6 month period during the 1992-1993 school year, occasionally for an hour or longer. The reasons for the confinement logged by the teachers included behaviors that were not physically aggressive; examples include, "whistling," "slouching," and "waving hands." In order to reach the room, the child was escorted out of his classroom in front of his peers, down a hallway, and to a location by the school auditorium. Although the door to the room was unlocked, a staff person would hold the door of the room closed to prevent him from leaving, and the child's hands became blistered at least once while trying to escape. On at least one occasion, the child claims he was physically restrained facedown on the floor. The school district felt that this approach was reasonable; however, a psychologist said that the child suffered from attention deficit hyperactivity disorder (ADHD), and his attorney argued that perhaps he couldn't control the behaviors that led to his confinement. As shown in pictures taken by the child's mother, the time-out room was small—approximately the length of an adult's arm span— and was lined with ripped and dirty padding. In addition, the student's mother reported that the room lacked ventilation and had an odor of "dirty feet and urine." When she visited the room and observed the conditions there, she requested that her son be transferred to another school.

The student brought a civil suit against the school district, alleging false imprisonment, negligent infliction of emotional distress, and a violation of the prohibition against unlawful seizure under the Fourth Amendment of the U.S. Constitution. The court awarded $75,000 to the student's family plus legal fees—$1,000 for each of the 75 times that the child was placed in the room. Based on our investigation, none of the educators associated with this case appear to have a criminal history. We were unable to determine whether they are still teaching.

## Cases Involving Restraint from Previous Work

The following three cases from our previous work on residential treatment programs confirm the finding that face down or other restraints that block the airway can be deadly. In these cases, staff members restrained the victims by holding them face down in the ground, resulting in death by severed artery, suffocation, and abnormal heartbeat, respectively. In addition, all the teens in these cases were diagnosed with disabilities.

**Table 2: Summary of Cases from Previous Work on Residential Treatment Centers for Troubled Youth**

| Case | Victim information | Program attended | Date of death | Case details related to use of restraint |
|------|--------------------|------------------|---------------|-------------------------------------------|
| 1 | Male, 15, Oregon resident | Oregon wilderness therapy program | 2000 | Refused to return to campsite but did not behave violently.<br>Restrained by staff and held face down to the ground for almost 45 minutes.<br>Died of severed artery in neck. |
| 2 | Male, 12, Texas resident | Texas residential treatment center | 2005 | Victim was angry and started banging his head against the ground.<br>A 5 feet,10 inch, muscular staff member placed the 87-pound victim into a facedown restraint.<br>Several witnesses claimed they saw the staff member lying across the back of the victim.<br>Victim complained he couldn't breathe and eventually became unresponsive, at which point the staff member removed the restraint.<br>Attempts to revive victim failed. |
| 3 | Male, 16, Pennsylvania resident | Pennsylvania psychiatric residential treatment center | 2006 | Victim was placed under "intense observation" for attempting to run away from the program.<br>Victim was ordered to put the hood of his sweatshirt down so that staff could see his face, but victim refused.<br>Three staff members brought the victim to another room and placed him in facedown restraint.<br>After 10 minutes of the restraint, victim complained that he couldn't breathe.<br>Victim died at the hospital 3 hours later from an abnormal heartbeat. |

Sources: Records including police reports, court documents, and interviews.

**Case 1:** The victim was a 15-year-old male who died while being restrained by two counselors. According to the victim's mother, in 2000 she enrolled her son in a wilderness program in Oregon to build his confidence and develop self-esteem in the wake of a childhood car accident. The accident had resulted in her son sustaining a severe head injury, among other injuries. According to her lawsuit, her son left the program headquarters on a group hike with three counselors and three other students. Several days into the multiday hike, the victim refused to return to the campsite after being escorted by a counselor about 200 yards to relieve himself. Two counselors then attempted to lead him back to the campsite. According to an account of the incident, when he continued to refuse, they tried to force him to return and they all fell to the ground together. The two counselors subsequently held the victim face down in the dirt until he stopped struggling; by one account a counselor sat on the victim for almost 45 minutes. When the counselors realized the victim was

no longer breathing, they telephoned for help and requested a 911 operator's advice on administering CPR. While the mother was driving to the hospital, her son's doctor called, advised her to pull to the side of the road, and informed her that her son had died. The victim's mother told us that she was informed, after the autopsy, that the main artery in her son's neck had been torn. The cause of death was listed as a homicide.

In September 2000, after the boy's death, one of the counselors was charged with criminally negligent homicide. A grand jury subsequently declined to indict him.

In early 2001, the mother of the victim filed a $1.5 million wrongful death lawsuit against the program, its parent company, and its president. The lawsuit was settled in 2002 for an undisclosed amount.

**Case 2:** The victim, who died in 2005, was a 12-year-old male. Documents obtained from the Texas Department of Family and Protective Services indicate that the victim had a troubled family background. He was taken into state care along with his siblings at the age of 6. As a ward of the state, the victim spent several years in various foster placements and youth programs before being placed in a private residential treatment center in August 2005. The program advertised itself as a "unique facility" that specialized in services for boys with learning disabilities and behavioral or emotional issues. The victim's caretakers chose to place him in this program because he was emotionally disturbed. Records indicate that he was covered by Medicaid.

On the evening of his death, the victim refused to take a shower and was ordered to sit on an outside porch. According to police reports, the victim began to bang his head repeatedly against the concrete floor of the porch, leading a staff member to drag him away from the porch and place him in a "lying basket restraint" for his own protection. During this restraint, the 4 feet 9½ inch tall, 87-pound boy was forced to lie on his stomach with his arms crossed under him as the staff member, a muscular male 5 feet 10 inches tall, held him still. Some of the children who witnessed the restraint said they saw the staff member lying across the victim's back. During the restraint, the victim fought against the staff member and yelled at him to stop. The staff member told police that the victim complained that he could not breathe, but added that children "always say that they cannot breathe during a restraint." According to police reports, after about 10 minutes of forced restraint, the staff member observed that the victim had calmed down and was no longer fighting back. The staff member slowly released the restraint and asked the victim if he wanted a jacket. The

victim did not respond. The staff member told police he interpreted the victim's silence as an unwillingness to talk because of anger about the restraint. He said he waited for a minute while the victim lay silently on the ground. When the victim did not respond to his question a second time, he tapped the victim on the shoulder and rolled him over. The staff member observed that the victim was pale and could not detect a pulse. All efforts to revive the victim failed, and he was declared dead at a nearby hospital.

Although the Texas Department of Family and Protective Services alleged that the victim's death was because of physical abuse, the official certificate of death stated that it was an accident and a grand jury declined to press charges against the staff member performing the restraint. However, the victim's siblings obtained a civil settlement against the program and the staff member for an undisclosed amount.

**Case 3:** The victim was 16 years old when he died, in February 2006, at a private psychiatric residential treatment facility in Pennsylvania for boys with behavioral or emotional problems. He was a large boy—6 feet 1 inch in height and weighing about 250 pounds—and suffered from bipolar disorder and asthma. The cost for placement in this facility was primarily paid for by Medicaid.

According to state investigative documents we obtained, the victim was placed in intensive observation after he attempted to run away. As part of the intensive observation, he was forced to sit in a chair in the hallway of the facility and was restricted from participating in some activities with other residents. On the day of his death, staff allowed the victim to participate in arts, crafts, and games with the other youth, but would not let him leave the living area to attend other recreational activities. Instead, staff told the victim that he would have to return to his chair in the hallway. In addition, staff told him that he would have to move his chair so that he could not see the television in another room. The victim complied, moving his chair out of view of the television, but put up the hood of his sweatshirt and turned his back toward the staff. The staff ordered him to take down his hood, but he refused. When one of the staff walked up to him and pulled his hood down, the victim jumped out of his chair and made a threatening posture with his fists, saying he did not want to be touched. The staff member and two coworkers then brought the victim to another room and held him facedown on the floor with his arms pulled up behind his back. The victim struggled against the restraint, yelling and trying to kick the three staff members holding him down. After about 10 minutes, the victim became limp and started breathing heavily. He

complained that he was having difficulties breathing. One staff member unzipped his sweatshirt and loosened the collar of his shirt, but rather than improve, the victim became unresponsive. The staff called emergency services and began CPR. The victim was taken by ambulance to a hospital, where he died a little more than 3 hours later. In the victim's autopsy report his death was ruled accidental, as caused by asphyxia and an abnormal heartbeat (cardiac dysrhythmia).

No criminal charges were filed in regard to the victim's death. The victim's mother filed a civil suit over her son's death against the facility. The suit was pending at the time we completed our investigation.

Mr. Chairman and Members of the Committee, this concludes my statement. I would be pleased to answer any questions that you or other members of the committee may have at this time.

## Contacts

For further information about this testimony, please contact Gregory D. Kutz at (202) 512-6722 or kutzg@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this testimony. In addition to the individual named above, the following individuals made key contributions to this testimony: Cindy Brown Barnes, John W. Cooney, Jennifer L. Costello, Paul R. Desaulniers, Eric G. Eskew, Georgeann M. Higgins, Christine A. Hodakievic, Jason Kelly, Barbara C. Lewis, Otis S. Martin, Flavio Martinez, Vicki R. McClure, James Murphy, Andrew A. O'Connell, Mary V. Osorno, Anthony A. Paras, Ramon J. Rodriguez, Kira Self, and Emily C.B. Wold.

# Appendix I: Summary of State Laws Related to the Use of Restraints and Seclusions in Public and Private Schools

The following list provides an overview of laws related to the use of restraints or seclusions in public and private schools in all 50 states and the District of Columbia.

**Alabama**

Ala. Code § 16-1-14 (Education; General Provisions)

- Local school boards may prescribe rules and regulations, subject to State Board of Education approval, that isolate or separate pupils who create disciplinary problems in any classroom or other school activity and whose presence in the class may be detrimental to the best interest and welfare of the class as a whole.

**Alaska**

Alaska Admin. Code tit. 4, §§ 07.010 - .900 (Education and Early Development; Student Rights and Responsibilities)

- The use of corporal punishment in Alaska public schools is prohibited. However, the definition of corporal punishment does not include the use of reasonable and necessary physical restraint of a student to protect the student or others from physical injury, to obtain possession of a weapon or other dangerous object from a student, to maintain reasonable order in the classroom or on school grounds, or to protect property from serious damage or destruction.

**Arizona**

None.

**Arkansas**

005-18 Ark. Code R. § 020 (Department of Education; Special Education and Related Services)

- Public agencies that provide education to children with disabilities must follow standards for use of a time-out seclusion room. Time-out seclusion should be used only for behaviors that are destructive to property, aggressive toward others, or severely disruptive to the class environment. Also, it should only be used as a last resort when less restrictive means are ineffective. Only necessary reasonable force may be used to place a student in such a room and, in general, time-out is not an appropriate intervention for classroom use with any students older than 12 unless they have made a contractual agreement for its

use. Rooms must meet certain guidelines, such as minimum size restrictions, and provide for continuous visual and auditory monitoring. The door should be such that it cannot be locked. The use of seclusion time-out must be stated in the student's IEP and have parental consent with documented written procedures. Maximum time to be spent in the room varies from 5 to 20 minutes, depending on the grade level. Careful consideration must be taken in extending the prescribed length of the seclusion. Records must be kept of each use of the room. Personnel must be adequately trained and supervised.

## California

Cal. Code Regs. tit. 5, § 3052 (Education; California Department of Education; Handicapped Children; Special Education; Implementation)

- Emergency interventions for special education students may only be used to control unpredictable, spontaneous behavior which poses a clear and present danger of serious physical harm to the individual or others and which cannot be immediately prevented by a response less restrictive than the temporary application of a technique used to contain the behavior.

- Emergency interventions may not include locked seclusion, the use of force that exceeds that which is reasonable and necessary under the circumstances, or the employment of a device or material or object which simultaneously immobilize all four extremities, except that techniques such as prone containment may be used as an emergency intervention by staff trained in such a procedure.

- Parents must be notified within one school day whenever an emergency intervention is used, and a Behavioral Emergency Report must be completed that includes details of the incident. The number of reports created annually is reported to the state Department of Education.

- No intervention may be used which is designed or likely to cause physical pain; which denies adequate sleep, food, water; shelter, bedding, physical comfort, or access to bathroom facilities; that precludes adequate supervision of the individual; or which deprives the individual of one or more of his or her senses.

## Colorado

Colo. Rev. Stat. §§ 26-20-101 to -109 (Human Services Code; Protection of Persons from Restraint)

- Certain state agencies, including the Colorado Department of Education, are subject to restrictions on the use of restraints. These include the requirement that restraints may only be used in cases of emergency and after the failure of less restrictive alternatives, unless such alternatives would be inappropriate or ineffective under the circumstances. Restraints may only be used for the purpose of preventing the continuation or renewal of an emergency, for the time period necessary, and with no more force than is necessary. However, the term "restraint" does not include the holding of an individual for less than 5 minutes by a staff person for the protection of the individual or other persons.

- Physical restraints must not place excess pressure on the chest or back or impede the ability to breathe, and staff must check to ensure that the breathing of the individual is not compromised.

- Agencies shall ensure that staff utilizing restraint are trained in its appropriate use, and agencies shall ensure each use of restraint is appropriately documented.

- Additional restrictions apply to the use of mechanical or chemical restraints.

1 Colo. Code Regs. § 301-45 (Department of Education; Colorado State Board of Education; Protection of Persons from Restraint)

- Restraints shall only be used in an emergency and with extreme caution and are limited to situations in which there is serious, probable, and imminent threat of bodily harm. In addition to formally adopting the above statutes, the regulations specify that restraints must never be used as a form of discipline or as a threat to control or gain compliance of a student's behavior. Only trained staff may administer restraints, and restraints may not be used in such a way that the student is prevented from breathing or communicating. A restrained student must be continuously monitored to ensure breathing is not compromised, and a student shall be released within 15 minutes, except where precluded for safety reasons. When the restraint is no longer necessary to protect the student or the safety others, it must be removed. A student's behavior plan must address the specific circumstances, procedures, and staff involved if there is a possibility that restraint may be used as part of crisis management. When it is anticipated that restraint will be used in an emergency situation, written parental permission must be obtained. Staff training must include a continuum of prevention and de-escalation techniques, as well as techniques that allow restraint in an upright or sitting position.

If a restraint is used, a written report must be submitted within one school day detailing the incident, the parents must be notified as soon as possible, and the incident must go through a review process.

**Connecticut**

Conn. Gen. Stat. §§ 46a-150 to -154 (Human Rights; Physical Restraint, Medication and Seclusion of Persons Receiving Care, Education, or Supervision in a School, Institution, or Facility)

- Providers of education to special education students may not use life-threatening physical restraints, defined as those restraints that restrict the flow of air into a person's lungs, whether by chest compression or other means. Involuntary physical restraint may not be used on special education students except as emergency intervention designed to prevent immediate or imminent injury to the person at risk or to others. The restraint may not be used for discipline or convenience and is not as a substitute for a less restrictive alternative. The use of physical restraint must be documented in the student's record, and parents must be notified. A special education student who is physically restrained must be continually monitored by a provider or assistant and regularly evaluated for indications of physical distress. Each incident must be fully documented, and all providers and assistant providers must be trained in the use of physical restraint, including de-escalation techniques, prevention strategies, types of physical restraints, differences between life-threatening restraints and other types, differences between permissible restraints and pain compliance techniques, and more. Incidents must be compiled and reported annually to the state.

- Special education students may not be placed in seclusion except as an emergency intervention to prevent immediate or imminent injury to the person or to others. The seclusion may not be used for discipline or convenience and is not used as a substitute for a less restrictive alternative. The use of seclusion must be documented in the student's record, and parents must be notified. A special education student who is involuntarily placed in seclusion must be frequently monitored by a provider or assistant and regularly evaluated for indications of physical distress. Each incident must be fully documented, and all providers and assistant providers must be trained in the use of seclusions. Incidents must be compiled and reported annually to the state.

**Delaware**

14-900 Del. Code Regs. § 929 (Department of Education; Special Populations)

- While "restraint" or "seclusion" are not discussed directly, a school's "emergency intervention procedures" and "behavior management procedures" for children with autism must be reviewed by the state's Human Rights Committee and Peer Review Committee. Parents must give informed consent for the use of each behavior management procedure, and may withdraw that consent at any time.

**District of Columbia**

D.C. Code §§ 38-2561.01 - .16 (Educational Institutions; Special Education; Nonpublic Schools)

- "Aversive intervention" includes a variety of practices, including the use of chemical restraints; withholding adequate sleep, shelter, clothing, bedding, or bathroom facilities; and withholding meals, essential nutrition, or hydration. Except in certain limited circumstances, no student whose education is funded by the D.C. government may be placed in a nonpublic special education school or program that allows the use of these aversive interventions.

**Florida**

None.

**Georgia**

None.

**Hawaii**

Hawaii Rev. Stat. § 302A-1141 (Government; Education; Education; Provisions Affecting System Structure; Organization)

- No physical punishment of any kind may be inflicted upon any pupil, but reasonable force may be used by a teacher in order to restrain a pupil in attendance at school from hurting oneself or any other person or property.

**Idaho**

None.

**Illinois**

<u>105 Ill. Comp. Stat. 5/2-3.130 (Schools; Common Schools; School Code; State Board of Education – Powers and Duties)</u>

- The State Board of Education is required to promulgate rules governing the use of time out and physical restraint in public schools.

<u>105 Ill. Comp. Stat. 5/10-20.33 (Schools; Common Schools; School Code; School Boards)</u>

- Until rules are adopted by the State Board of Education, the use of physical restraints is prohibited except where the student poses a physical risk to persons, there is no medical contraindication to its use, and the staff applying it have been trained in its safe application. "Restraint" does not include momentary periods of physical restriction by direct person-to-person contact with limited force that is designed to prevent a student from completing an act that would result in potential physical harm to persons or damage to property, or to remove a student who is unwilling to leave an area voluntarily. Uses of restraint must be documented and parents notified.

- Until rules are adopted by the State Board of Education, timeout rooms cannot lock other than with a mechanism that engages when a key or handle is being held by a person, cannot be a confining space such as a closet or box, and cannot be a room where the student cannot be continually observed.

<u>ll. Admin. Code tit. 28, §§ 1.280, .285 (Education and Cultural Resources; Education; State Board of Education; Public School Recognition; Public Schools Evaluation, Recognition and Supervision; School Governance)</u>

- The restrictions listed in 105 Ill. Comp. Stat. 5/10-20.33 are repeated and adopted. In addition, physical restraint may only be used as a means of maintaining discipline and only to the extent necessary to preserve the safety of students and others. It may not be used as a form of punishment. Only specific, planned techniques are permitted.

- Students are not subject to restraint for using profanity, verbal displays of disrespect, or verbal threats unless accompanied by a means or intent to carry out the threat. Except under certain limited

circumstances, the use of mechanical or chemical restraints is prohibited. Use of restraint shall take into consideration the safety and security of the student, and it shall not rely on pain as an intentional method of control. If the student uses sign language or an augmentative mode of primary communication, the student shall be permitted to have the student's hands free of restraint for brief periods, unless the adult determines that such freedom appears likely to result in harm to self or others. The restraint must end as soon as the student is no longer in imminent danger of causing physical harm to persons.

- Detailed records of each incident must be kept, and parents must be notified within 24 hours. Training must include alternatives to restraint, de-escalation procedures, the experience of administering and receiving a variety of restraint techniques, how to monitor for physical signs of distress, and retraining every 2 years. School districts must review the use of restraints annually.

- Isolated time out may only be used as a means of maintaining discipline and only to the extent necessary to preserve the safety of students and others. It may not be used as a form of punishment.

- Enclosures used for isolated time out must meet size requirements, be free of materials that can be used to cause harm, and be designed to permit continuous visual monitoring of and communication with the student. Doors, if used, must be steel or wood with a solid-core constriction, with an unbreakable viewing panel. An adult must remain within two feet and must be able to see the student at all times. If the enclosure has a locking mechanism, it must only be engaged when it is held in position by a person, or if electronically engaged, must automatically release if the building's fire alarm system is activated. A student may not be kept in isolated time out for more than 30 minutes after the problematic behavior has ceased.

- Detailed records of each incident must be kept, and parents must be notified within 24 hours. School districts must review the use of isolated time out annually.

Ill. Admin. Code tit. 23, § 401.250 (Education and Cultural Resources; Education; State Board of Education; Nonpublic Elementary and Secondary Schools; Special Education Facilities Under Section 14-7.02 of the School Code; Operations Requirements)

- Private, special education facilities must have their staff trained in the use of isolated time out and restraint according to the requirements of Ill. Admin. Code tit. 28, §§ 1.280, .285

**Indiana**

None.

**Iowa**

Iowa Admin. Code §§ 281-103.1 - .8 (Education Department; Protection of Children; Corporal Punishment Ban; Restraint; Physical Confinement and Detention)

• Corporal punishment is prohibited, but does not include using reasonable and necessary force: in order to quell a disturbance or prevent physical harm to any person; in order to obtain possession of a weapon or other dangerous object; for the purposes of self-defense or defense of others; for the protection of property; to remove a disruptive pupil from class or school premises, or from school-sponsored activities off school premises; to prevent a student from the self-infliction of harm; or to protect the safety of others.

• Physical restraint shall not be used as discipline for minor infractions and may be used only after other disciplinary techniques have been attempted, if reasonable. All school employees must receive adequate and periodic training, which must include alternatives to restraint, crisis prevention and intervention, de-escalation techniques, and its safe and effective use. The restraint must be reasonable and necessary in duration, and each occurrence must be documented. Parents must be notified of any occurrence the same day, if possible.

• Prone restraints are prohibited, as is any restraint that obstructs the airway of any child. If the student uses sign language or an augmentative mode of primary communication, the student must be permitted to have the student's hands free of restraint for brief periods, unless an employee determines that such freedom appears likely to result in harm to self or others.

• Physical confinement shall not be used as discipline for minor infractions and may be used only after other disciplinary techniques have been attempted, if reasonable under the circumstances. All school employees must receive adequate and periodic training, which must include alternatives to seclusion, and the safe and effective use of physical confinement. Parents must be notified of any occurrence the same day, if possible.

- If a student is physically confined, the area of confinement must be of reasonable dimensions, and must be free from hazards and dangerous objects or instruments, considering the characteristics and condition of the student. There must be sufficient light and ventilation, a comfortable temperature, and reasonable break periods to attend to bodily needs. The time period must be reasonable considering the characteristics and condition of the student, and continuous adult supervision is required. If the room has a locking mechanism, it must only be engaged when it is held in position by a person, or if electronically engaged, must automatically release if the building's fire alarm system is activated or electrical power is interrupted.

**Kansas**

None.

**Kentucky**

None.

**Louisiana**

None.

**Maine**

Me. Rev. Stat. Ann. tit. 20, § 4502 (Education; Elementary and Secondary Education; Elementary and Secondary Schools; Basic School Approval)

- Timeout areas must be well ventilated, sufficiently lighted, and may not be locked. The student must be either supervised by staff in the room or observed and heard by a person outside the room.

05-071-033 Me. Code R. §§ 1.1 – 5.1 (Department of Education; General; Regulations Governing Time Out Rooms, Therapeutic Restraints, and Aversives in Public Schools and Approved Private Schools

- Local school administrative units and approved private schools must develop policies for isolated timeout rooms and therapeutic restraint consistent with these regulations. Policies must be reviewed at least annually. Each use shall be documented, and parents must be notified as soon practical.

- Therapeutic restraint may be used by trained staff to prevent injury to the student or others. It may be used either as an emergency

intervention or as part of an intervention plan, but only after less intrusive efforts have been attempted. The restraint shall use the least amount of physical contact necessary, and requires the presence of at least two adults, unless there is an emergency situation. Restraint shall not exceed one hour, unless the student is still presenting dangerous behavior. Mechanical and chemical restraints are prohibited. Individuals must be trained in the use of restraints, including de-escalation techniques.

- Timeout rooms are used to reduce dangerous behavior and only after less intrusive interventions have failed. They may be used either as an emergency intervention or as part of an intervention plan, but not for punitive purposes, staff convenience, or to control minor misbehavior.

- Use of the room shall not exceed one hour, unless the student is still presenting dangerous behavior. Students in a timeout room shall be directly observed at all times. Rooms must meet certain physical requirement, and have adequate light, hear, and ventilation. The door may not be locked, and must include an unbreakable observation window.

**Maryland**

Md. Code Regs. 13A.08.04.01 - .06 (State Board of Education; Students; Student Behavior Interventions)

- The restraint, exclusion and seclusion policies apply to public agencies and nonpublic schools. Restraint and seclusion may only be used: after less restrictive approaches have been considered; in a humane, safe, and effective manner; without intent to harm or create undue discomfort; and consistent with medical and psychological limitations and the student's intervention plan. Schools must review these policies annually.

- Restraint does not include briefly holding a student to calm, comfort, or escort the student safely, moving a disruptive student who is unwilling to leave the area if other methods are unsuccessful, or intervening in a fight. The use of restraint is prohibited unless there is an emergency and the restraint is necessary to protect persons from imminent, serious, physical harm; it is permitted under the student's IEP; or the parents of a nondisabled student have provided written consent while a behavior plan is being developed. Only trained school personnel may apply restraints, and they may only use reasonable force. The use of mechanical restraints is prohibited except in specific

circumstances. Each instance of restraint must be documented, and parents must be notified within 24 hours.

- "Exclusion" means removing a student to a supervised area for a limited period of time. This may be used when the student's behavior unreasonably interferes with the student's or other's learning, or the behavior is an emergency and the exclusion is necessary to protect persons from imminent, serious, physical harm. School personnel must be able to see the student at all time, the exclusion area must provide adequate lighting, ventilation, and furniture, and the area must be unlocked and free of barriers. Exclusion periods may not exceed 30 minutes.

- "Seclusion" means the confinement of a student alone in a room from which the student is physically prevented from leaving. The use of seclusion is prohibited, unless there is an emergency and the seclusion is necessary to protect persons from imminent, serious, physical harm; it is permitted under the student's IEP; or the parents of a nondiabled student have provided written consent while a behavior plan is being developed. Seclusion rooms must be free of objects that could cause harm, provide an adequate view of the student, and provide adequate lighting and ventilation. School personnel must view the student at all times, and reassess every 30 minutes. Each instance of seclusion must be documented, and parents must be notified within 24 hours.

**Massachusetts**

603 Mass. Code Regs. 18.05 (Department of Education; Program and Safety Standards for Approved Public or Private Day and Residential Special Education School Programs)

- Schools providing special education services must provide to parents, prior to admission, a copy of the school's policies and procedure related to restraints, exclusion, time out, and other aversive procedures. Written informed consent from the parent is required prior to utilizing these techniques.

- Day special educational programs, residential special education programs, and special education programs within mental health facilities must all comply with their respective regulations regarding the use of restraints and seclusion.

- A school's behavior management policy regarding seclusion must include guidelines for staff, the duration of the procedure including higher approval needed for any period longer than 30 minutes, the

requirement that students shall be observable at all times, a procedure for staff to directly observe the student every 15 minutes, documentation requirements, and the requirements that the room may not be locked and must be safe.

603 Mass. Code Regs. 46.01 - .07 (Department of Education; Physical Restraint)

- This regulation applies only to students in publicly funded elementary and secondary education programs. Physical restraints may only be used in emergency situations, after less intrusive alternatives have failed, and with extreme caution. Schools must develop written procedures that are reviewed annually and include an explanation of the method of restraint, training requirements, reporting requirements, and complaint procedures.

- All staff must be trained within the first month of each school year on types of restraints with related safety considerations, and some staff must receive additional in-depth training that includes de-escalation procedures, methods for evaluating the risk of harm in individual situations, the simulated experience of administering and receiving restraint, and more.

- Restraint may only be used when non-physical interventions would not be effective, and the student's behavior poses a threat of imminent, serious, physical harm to self or others. Only reasonable force may be used. Restraint may not be used as a means of punishment or as a response to property destruction, disruption of school order, refusal to comply with school rules or directives, or verbal threats that do not constitute a threat of imminent, serious, physical harm. Only trained personnel may administer restraints, except to protect persons from imminent, serious physical harm, and when possible the restraint must be witnessed by at least one other adult. The safest method available and appropriate must be used, and floor or prone restraints are prohibited unless the method is required and the staff member has received in-depth training. Restraint must be discontinued as soon as possible; if it continues for more than 20 minutes, additional reporting requirements apply. No restraint may be administered in such a way that the student is prevented from breathing or speaking, and staff must continuously monitor the physical status of the student. Each incident must be reviewed and documented, and restraint reports may be reviewed by the Department of Education. Parents must be notified as soon as possible.

GAO-09-719T

**Michigan**

Mich. Comp. Laws Serv. § 380.1312 (School Code of 1976; The Revised School Code; Boards of Education, Powers and Duties Generally)

- Corporal punishment is prohibited. However, school personnel may use reasonable physical force: upon a pupil to restrain or remove a pupil whose behavior is interfering with the orderly exercise and performance of school district or public school academy functions, if that pupil has refused to comply with a request to refrain from further disruptive acts; for self-defense or the defense of another person; to prevent self-injury; to quell a disturbance that threatens physical injury to any person; to obtain possession of a weapon or other dangerous object upon or within the control of a pupil; or, to protect property.

**Minnesota**

Minn. Stat. §§ 121A.58 -.67 (Education Code: Prekindergarten – Grade 12; Student Rights, Responsibilities, and Behavior; Discipline, All Students)

- Corporal punishment is not allowed. However, a teacher or principal may use reasonable force when necessary to correct or restrain a student or prevent bodily harm or death.

- The Commissioner of the Minnesota Department of Education must promulgate rules that govern the use of aversive procedures on children with a disability. These rules must require that the planned application of aversive and deprivation procedures only be instituted after developing a behavior intervention plan, and that education personnel will notify parents on the same day that aversive or deprivation procedures are used.

- Rules for the use of aversive procedures on children with a disability must also include requirements: that the use of locked time-out have standards such as requiring a safe environment, continuous monitoring, ventilation, adequate space, a locking mechanism that disengages automatically when not continuously engaged, and more; that the commissioner make unannounced on-site visits to monitor locked time-out rooms; and that a student may only be placed in locked time-out if it is part of the student's behavior intervention plan, or it is an emergency and only for the emergency's duration.

Minn. R. 3525.2900 (Department of Education; Children with a Disability)

- In addition to adopting the above restrictions, students in time-out seclusion must have adequate access to drinking water and a bathroom for a time-out that exceeds 15 minutes. Documentation of the time-out is required. The time-out area must be a safe environment without hazards; have adequate light, heat, and ventilation; have an observation window; and meet size specifications that allow the pupil to stand, stretch arms, and lie down.

**Mississippi**

None.

**Missouri**

None.

**Montana**

Mont. Code Ann. § 20-4-302 (Education; Teacher, Superintendents, and Principals; Teachers' Powers, Duties, and Privileges)

- Corporal punishment is prohibited. However, school personnel may use physical restraint that is reasonable and necessary, even if it causes physical pain, to quell a disturbance, provide self-protection, protect persons from physical injury, obtain possession of a weapon or dangerous object from the pupil, maintain the orderly conduct of a pupil, or protect property from serious harm.

Mont. Admin. R. 10.16.3346 (Department of Education; Special Education; Services)

- "Aversive treatment procedures" include physical restraint and isolation time-out. Aversive treatment procedures may be used on a special education student who exhibits behaviors which pose a risk of physical harm to the student or others, a risk of significant damage to property, or significantly disruptive or dangerous behaviors. Aversive treatment procedures must be designed to address the behavioral needs of an individual student, be approved by the IEP team, and may not be used as punishment, for the convenience of staff, or as a substitute for positive behavioral interventions. Any procedure intended solely to cause pain is prohibited.

- Mechanical restraints are prohibited, except in limited circumstances.

- A student in isolation time out must be under direct constant visual observation of a staff person. Isolation in a locked room is prohibited.

**Nebraska**

None.

**Nevada**

Nev. Rev. Stat. Ann. §§ 388.521 - .5315 (Education; System of Public Instruction; Pupils with Disabilities and Gifted and Talented Pupils; Use of Aversive Intervention, Physical Restraint and Mechanical Restraint on Pupils with Disabilities)

- Mechanical restraints are prohibited, unless under certain circumstances where a medical order authorizing its use has been obtained. Additional rules also apply to the use of mechanical restraints.

- Physical restraints may not be used on a pupil with a disability, unless an emergency exists where the restraint is necessary to protect the physical safety of persons from an immediate threat of physical injury or to protect against an immediate threat of severe property damage. The restraint may be for no longer than is necessary, and the use of force may not exceed that which is reasonable and necessary under the circumstances. Instances must be documented and reported to the school district and the parents. Staff authorized to carry out physical restraints must be trained in its use.

- "Aversive intervention" includes the placement of a person in a room, alone, where release from the room is prohibited. Aversive interventions are prohibited when used on a pupil with a disability.

**New Hampshire**

N.H. Code Admin. R. Ann. Ed. 1113.04 - .09 (Board of Education; Standards for the Education of Children with Disabilities; Requirements for the Development and Operation of Programs for Children with Disabilities Administered by Local Education Agencies)

- Public or private providers of special education may not employ aversive behavioral interventions, except in response to the threat of imminent, serious physical harm. These include any procedure intended to cause physical pain, placement of a child in an unsupervised or unobserved room from which the child can not exit,

and physical restraint. However, if authorized in writing by a physician and an IEP team, then non-medical mechanical restraint and physical restraint not in response to imminent, serious, physical harm may be used. Staff must be trained to use procedures and in alternative de-escalation techniques, and the parents must give informed consent for the use of these procedures separate from the IEP consent.

**New Jersey**

None.

**New Mexico**

N.M. Stat. Ann. §§ 32A-6A-1 to -10 (Children's Code; Children's Mental Health and Developmental Disabilities Act)

- "Aversive interventions," which includes interventions causing physical pain and isolation, are prohibited. When providing treatment or habilitation services to children with severe developmental disabilities, physical restraint and seclusion may not be used except in an emergency situation in which it's necessary to protect a child or another from imminent, serious physical harm or unless a less intrusive intervention has failed. Programs shall provide a copy of the restraint and seclusion polices and procedures to the child's legal custodian. Staff administering restraints and seclusions must be trained in positive behavior interventions, methods for identifying and defusing potentially dangerous behavior, and restraint and seclusion. Incidents of restraint and seclusion must be documented, and the child's legal custodian must be notified immediately. After the incident, there must be a debriefing with the child.

- Only reasonable force as is necessary to protect the child or other person from imminent and serious physical harm may be used. The restraint must be reassessed at least every 30 minutes. Mechanical restraints are prohibited except under certain circumstances.

- Seclusion may only be applied by trained staff, and the seclusion room must be free of hazards, provide staff an adequate and continuous view of the child, and provide adequate lighting and ventilation. Staff must view the child at all times, and must reassess at least every 30 minutes.

**New York**

N.Y. Comp. Codes R. & Regs. tit. 8, § 19.5 (Education Department; Rules of the Board of Regents; Education Practices)

- Corporal punishment is prohibited. However, reasonable force may be used to protect oneself or any person from physical injury, to protect property, or to restrain or remove a pupil whose behavior is interfering with the orderly exercise and performance of school functions, powers and duties.

- Aversive interventions, defined as interventions intended to induce pain or discomfort for the purpose of eliminating maladaptive behaviors, are prohibited. This includes movement limitations used as a punishment.

N.Y. Comp. Codes R. & Regs. tit. 8, § 200.22 (Education Department; Regulations of the Commissioner; Handicapped Children; Children with Handicapping Conditions)

- A behavioral intervention plan shall not include the use of aversive interventions, but a child-specific exception may be granted under certain circumstances where the student is displaying aggressive behaviors that threaten the physical well being of the student or others. The use of aversive interventions may only be done by trained staff and with parental consent.

- Emergency interventions involving the use of reasonable physical force is permissible in situations in which alternative procedures cannot be reasonably employed. They may not be used as punishment, and staff must be provided with appropriate training in safe and effective restraint procedures. Each incident must be documented, and parents must be notified.

- Time out rooms are only to be used in conjunction with a behavioral intervention plan, except for unanticipated situations that pose an immediate concern for physical safety. A student may not be placed in a locked room or in a room where the student cannot be continuously observed and supervised. The room must be adequate size to allow the student to move about and recline, it should be without hazards, and have adequate lighting, ventilation, and temperature. The room must be unlocked and the door able to be opened from the inside.

- Schools must develop policies that include factors that precipitate the use of the room, time limitations, staff training, data collection, and information to be provided to parents. Staff must continuously monitor the student. A student's IEP must specify the use of a time out room, and parents must be given the opportunity to see the physical space and receive a copy of the school's policy.

**North Carolina**

<u>N.C. Gen. Stat. § 115C-391.1 (Elementary and Secondary Education;
Students; Discipline)</u>

- School personnel must notify the principal of any use of aversive
  procedures, any use of physical restraint resulting in observable
  physical injury to a student, or any use of seclusion that exceeds 10
  minutes or the time specified in the behavior intervention plan. The
  student's parents must be promptly notified, and the incident must be
  documented.

- Physical restraint is prohibited, except as reasonably needed to obtain
  possession of a weapon or other dangerous object, to maintain order or
  prevent or break up a fight, for self-defense, to ensure the safety of any
  person, to prevent imminent destruction of property, or if used as
  provided for in a student's IEP. Physical restraint is not permitted when
  used solely as a disciplinary consequence.

- Mechanical restraint is prohibited, except under certain circumstances.

- Seclusion is the confinement of a student alone in an enclosed space
  from which the student is physically prevented from leaving by locking
  hardware or other means. Seclusion is prohibited, except as reasonably
  needed to respond to a person in control of a weapon or other
  dangerous object, to maintain order or prevent or break up a fight, for
  self-defense, to respond to a student's behavior which poses a threat of
  imminent physical harm to self or others or imminent substantial
  destruction of property, or when used as specified in the student's IEP.

- The student in seclusion must be monitored by an adult who is able to
  see and hear the student at all times, and the seclusion must be
  released upon cessation of the behaviors that led to the seclusion. The
  seclusion space must have been approved by the local education
  agency and have appropriate light, ventilation, and temperature, and be
  free of hazards. Seclusion is not permitted when used solely as a
  disciplinary consequence.

- Isolation is a behavior management technique in which a student is
  placed alone in an enclosed space from which the student is not
  prevented from leaving. Isolation is permitted provided that the space
  used has appropriate light, ventilation, and temperature; the duration is
  reasonable in light of the purpose; the student is reasonable monitored;
  and, the space is free of hazards.

**North Dakota**

None.

**Ohio**

Ohio Rev. Code Ann. § 3319.41 (Education – Libraries; Schools – Superintendent, Teachers, Employees; School Reports)

- Corporal punishment is prohibited, unless the board of education of a school district has taken certain steps to permit it. However, staff may use and apply such amount of force and restraint as is reasonable and necessary to quell a disturbance threatening physical injury to others, to obtain possession of weapons or other dangerous objects upon the person or within the control of the pupil, for the purpose of self-defense, or for the protection of persons or property.

**Oklahoma**

None.

**Oregon**

Or. Admin. R. 581-021-0060 to -0062 (Oregon Department of Education; School Governance and Student Conduct; Student Conduct and Discipline)

- Corporal punishment is prohibited. However, corporal punishment does not include physical pain or discomfort resulting from physical restraint or seclusion that is part of a behavior support plan, that includes an individual limit on the number of incidents within a specified time period, and that is carried out under set policies and procedures.

- The use of physical restraint or seclusion may only be used as part of a behavior support plan that was developed with the parents, when less restrictive interventions would not be effective and the student's behavior poses a threat of imminent, serious, physical harm to the student or others; or, in an emergency as necessary to maintain order or to prevent a student from harming him/herself, other students, and school staff or property.

- Restraint or seclusion may only be used for as long as the behavior poses a threat of imminent, serious physical harm. Staff must

continuously monitor a student's status during the restraint or seclusion. Staff must be trained to use restraint or seclusion, including training in prevention and de-escalation techniques. Parental notification by the end of the day is required, and each incident must be documented.

- Seclusion rooms must allow for a full view of the student at all times, and be free of potentially hazardous conditions.

**Pennsylvania**

22 Pa. Code § 14.133 (Education; State Board of Education; Miscellaneous Provisions; Special Education Services and Programs; IEP)

- Restraints to control acute or episodic aggressive or self-injurious behavior may only be used when the student is a clear and present danger to himself, other students, or employees, and only when less restrictive techniques are less effective. Parental notification is required. The use of restraints may only be included in an IEP when: the restraint is utilized with specific component elements of positive behavior support; the restraint is used in conjunction with the teaching of alternate behavior; staff are authorized to use the procedure and have receiving required training; and there is a plan for eliminating the use of restraint through the application of positive behavior support. Parental consent must be obtained prior to the use of restraints. The use of prone restraints is prohibited. Data on the use of restraints must be maintained and reported. Restraint may not be used for the convenience of staff or as punishment. Mechanical restraints may only be used in certain circumstances.

- Locked rooms, locked boxes or other structures or spaces from which the student cannot readily exit are prohibited.

**Rhode Island**

08-010-013 R.I. Code R. §§ 1.0 – 10.0 (Department of Elementary and Secondary Education; Board of Regents for Elementary and Secondary Education; Physical Restraint)

- Public education programs must develop procedures regarding the use of physical restraint and crisis intervention. These must be reviewed annually and made available to parents. Staff must receive annual training on the restraint policy, de-escalation techniques, types of restraints and related safety considerations, and how to administer restraint in accordance with known medical or psychological

limitations applicable to an individual student. Some staff must receive advanced training, which must include the simulated experience of administering and receiving physical restraint, instruction regarding the effects on the person restrained and on monitoring physical signs of distress, and more.

- Prone containment, which simultaneously immobilizes all four extremities, is prohibited except when used by trained personnel as a limited emergency intervention that is a documented part of a previously agreed upon written behavioral intervention plan. These rules do not limit school staff from using reasonable force to protect students, other persons or themselves from imminent, serious physical harm.

- Physical restraint may only be used when non-physical interventions would not be effective, the student's behavior poses a threat of imminent, serious, physical harm to self or others, and any applicable positive techniques from the student's behavioral intervention plan have been attempted. It is limited to the use of reasonable, necessary force. Physical restraint may not be used as a means of punishment or as an intervention designed or likely to cause physical pain. Only trained personnel may administer restraints, and when possible it must be witnessed by at least one other adult who does not participate in the restraint. No restraint may prevent a student from breathing or speaking, and the student must be continuously monitored. The restraint must be released as soon as the student is no longer at risk of causing imminent physical harm to self or others. Each incident must be documented, there must be follow-up, and parents must be notified as soon as possible but no later than two school days later.

- Seclusion, placing a child alone in a locked room without supervision, is strictly prohibited. Seclusion is permitted when the student is under constant surveillance and observation and when documented as part of a previously agreed upon written behavioral intervention plan. Any intervention which denies adequate sleep, food, water, shelter, bedding or access to bathroom facilities is also prohibited.

**South Carolina**

None.

**South Dakota**

None.

**Tennessee**

Tenn. Code Ann. §§ 49-10-1301 to -1306 (Education; Special Education; Special Education Isolation and Restraint Modernization and Positive Behavioral Supports Act)

- A special education student may only be restrained or isolated if the restraint or isolation is provided for in the student's IEP, or if there is an emergency and it is necessary to assure the physical safety of the student or others nearby. If an emergency situation, school personnel must immediately contact those school personnel designated to authorize the isolation or restraint, and they must evaluate the student's condition within a reasonable time. Parents must be notified the same day. Each incident must be documented. School personnel must remain in the physical presence of any restrained student and must continuously observe a student who is in isolation or being restrained to monitor the health and well-being of the student.

- As applied to special education students, chemical restraints are prohibited against unless under the direction of a physician and with parental consent; mechanical restraints are prohibited; and any form of life-threatening restraint, including restraint that restricts the flow of air into a person's lungs, is prohibited. Additionally, the use of isolation or physical restraint as a means of coercion, punishment, convenience, or retaliation is prohibited.

- Actions undertaken by school personnel to break up a fight or to take a weapon from a student are not prohibited.

- As applied to special education students, the use of a locked door or other structure that accomplishes the intent of locking a student in a room or structure, to isolate or seclude a student, is prohibited.

**Texas**

Tex. Educ. Code Ann. § 37.0021 (Education Code; Public Education; Safe Schools; Discipline, Law and Order; Alternative Settings for Behavior Management)

- Rules must be promulgated for the use of restraint and time-out by school personnel.

- Seclusion is a behavior management technique in which a student is confined in a locked space that is designed solely to seclude a person

and contains less than 50 square feet of space. School personnel may not place a student in seclusion.

- This section does not prevent a student's locked, unattended confinement in an emergency situation while awaiting the arrival of law enforcement if the student possesses a weapon and the confinement is necessary to prevent bodily harm to the student or another person.

19 Tex. Admin. Code § 89.1053 (Education; Texas Education Agency; Adaptations for Special Populations; Commissioner's Rules Concerning Special Education Services; Clarification of Provisions in Federal Regulations and State Law)

- School personnel may only use restraint in an emergency in which a student's behavior poses a threat of imminent, serious physical harm to the student or others or imminent, serious property destruction. Restraint shall be limited to reasonable force as is necessary to address the emergency, shall be discontinued when the emergency no longer exists, shall be implemented as to protect the health and safety of the student, and shall not deprive the student of basic human necessities.

- A core team of school personnel must be trained in the use of restraint and must include special education personnel likely to use restraint. Personnel who use restraint but who have not received training must receive training within 30 days following the use of restraint. Training must include prevention and de-escalation techniques. Each incident must be documented, and parents must be notified the same day.

- Time-out is a behavior management technique in which the student is separated from other students in a setting that is not locked and from which the exit is not blocked. Physical force or threats may not be used to place a student in time-out. Time-out must be included in the student's IEP if it is utilized on a recurrent basis. School personnel must be trained in the use of time-out. Each instance must be documented.

**Utah**

Utah Code Ann. §§ 53A-11-801 to -806 (State System of Public Education; Students in Public Schools; Physical Restraint Guidelines)

- Corporal punishment is prohibited, unless the parents have provided written permission. However, corporal punishment does not include the use of reasonable and necessary physical restraint or force in self-defense, to obtain possession of a weapon or dangerous object, to

protect the child or another person from physical injury, to remove from a situation a child who is violent or disruptive, or to protect property from damage.

- Behavior reduction intervention for students with disabilities is excepted from this part under certain circumstances.

**Vermont**

None.

**Virginia**

8 Va. Admin. Code § 20-670-130 (Education; State Board of Education; Regulation Governing the Operation of Private Day School for Students with Disabilities; Program Requirements)

- This section only applies to private day schools whose primary purpose is to provide educational services to persons with autism, developmental disabilities, deafness, mental retardation, emotional disturbance, learning disability or other certain disabilities. It does not apply to public schools or private day schools whose primary purpose is to provide educational services to students without disabilities, even though it may also serve children with disabilities.

- Parents must be informed of the policies of the school's behavior management or modification program, and informed consent must be obtained before implementation of any behavior management program.

- The use of physical restraints must follow written policies and procedures. Physical restraint is limited to that which is minimally necessary to protect the student or others and may only be used by trained staff after less intrusive interventions have failed and when failure to restrain would result in harm to students or others. Staff must review the training at least annually. Each incident must be documented and reported to the parents.

- Corporal punishment and the use of restraint as punishment, reprisal, or convenience is prohibited. The use of mechanical and chemical restraints is also prohibited.

**Washington**

Wash. Admin. Code 392-172A-03120 to -03135 (Superintendent of Public
Instruction; Rules for the Provision of Special Education; Aversive
Interventions)

- No school district may authorize or allow the use of aversive
  interventions on a special education student if the intervention would
  violate the conditions of this part.

- The use of force or restraint which is either unreasonable under the
  circumstances or deemed to be an unreasonable form of corporal
  punishment is prohibited. This includes interfering with a student's
  breathing, or physically restraining a student by binding or otherwise
  attaching the student's limbs together or by binding or otherwise
  attaching any part of the student's body to an object. However, this
  type is restraint is permissible if it is used when and to the extent
  reasonably necessary to protect the student, other persons, or property
  from serious harm. The restraint, including the duration of its use, must
  be provided for by the terms of the student's IEP. An adult must remain
  in visual or auditory range, and the student must either be capable of
  releasing himself or herself from the restraint, or must continuously
  remain within view of an adult.

- Aversive intervention does not include the use of reasonable force,
  restraint, or other treatment to control unpredicted spontaneous
  behavior which is a clear and present danger of serious harm to the
  student or another person, a clear and present danger of serious harm
  to property, or a clear and present danger of seriously disputing the
  educational process.

- Isolation, including the duration of its use, must be provided for by the
  terms of the student's IEP. The enclosure must be ventilated, lighted,
  temperature controlled, and permit continuous visual monitoring of the
  student from the outside. An adult must remain in visual or auditory
  range. The student must either be capable of releasing himself or
  herself from the enclosure, or must continuously remain within view of
  an adult.

**West Virginia**

W. Va. Code R. § 126-28-8 (Procedural Rule; West Virginia Board of
Education; West Virginia's Universal Access to a Quality Early Education
System)

- Staff members in a West Virginia pre-k classroom may not handle behavior problems by restraining a child by any means other than a firm grasp around a child's arms or legs and then for only as long as is necessary for the child to regain control.

- Staff members in a West Virginia Pre-k classroom may not handle behavior problems by isolating a child without supervision or placing the child in a dark area.

**Wisconsin**

None.

**Wyoming**

None.

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday afternoon, GAO posts on its Web site newly released reports, testimony, and correspondence. To have GAO e-mail you a list of newly posted products, go to www.gao.gov and select "E-mail Updates." |
| **Order by Phone** | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's Web site, http://www.gao.gov/ordering.htm.<br><br>Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537.<br><br>Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact:<br><br>Web site: www.gao.gov/fraudnet/fraudnet.htm<br>E-mail: fraudnet@gao.gov<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Ralph Dawn, Managing Director, dawnr@gao.gov, (202) 512-4400<br>U.S. Government Accountability Office, 441 G Street NW, Room 7125<br>Washington, DC 20548 |
| **Public Affairs** | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800<br>U.S. Government Accountability Office, 441 G Street NW, Room 7149<br>Washington, DC 20548 |